## No. 13,289.

### STATE OF LOUISIANA VS. JOSEPH YOUNG.

#### SYLLABUS.

The rule of law demands that the confession of on accused shall have been made voluntarily and without the appliance of hope, or fear by any other person; and that the law can not measure the force of the influence, or decide upon its effect upon the mind of the accused; and therefore excludes the declaration if any degree of influence has been exerted.

The proof must show that the making of the statement was voluntary.

APPEAL from Eleventh Judicial District, Parish of St .Landry. Dupre, J.

*Milton J. Cunningham,* Attorney General, and *R. Lee Garland,* for Plaintiff, Appellee.

*E. P. Veazie* and *J. R. Pavy* for Defendant, Appellant.

The opinion of the court was delivered by

WATKINS, J. The defendant was prosecuted for an attempt to commit rape upon one Alice Carriere, and on trial was, by the jury, found guilty as charged and sentenced to imprisonment in the penitentiary for a term of five years; and from said verdict and sentence he prosecutes this appeal.

During the progress of the trial, there was but one bill of exceptions retained, and upon same the defendant relies for relief at our hands.

That bill of exceptions relates to the testimony of several witnesses

for the State, the tendency of which was to establish a voluntary declaration made by the accused, and the objection to which was "that such declaration was not, in fact, free and voluntary."

Upon this objection, testimony was taken and reduced to writing, and same was annexed to and forms a part of said bill of exceptions— the trial judge entertaining the opinion that the testimony was admissible, and that said declaration was free and voluntary.

We have made from the record the following extracts from the testimony of witnesses:

"Wiltz O'Quin sworn, says:

"Q.  When you got home, where did you see the accused party?

"A.  After I got home they brought him to my gate.

"Q.  Who brought him to your gate?

"A.  Dan Gibbs, the uncle of the girl named in the information.

"Q.  Who else were with him?

"A.  I don't know, I did not pay any attention, there were two or three of them following.

"Q.  Were they making any demonstration as if to harm him?

"A.  No, sir.

"Q.  How did they have him tied?

"A.  They had a plow line around his neck.

"Q.  Did any one say in your presence that they intended to do him bodily harm?

"A.  No, sir.

"Q.  Were his hands tied?

"A.  No, sir.

"Q.  How many men had a hold of the rope?

"A.  Only one.

"Q.  Was he excited?

"A.  No, sir.

"Q.  When you spoke to him had you told him anything to frighten him or induce him to make a statement?

"A.  No, sir.

"Q.  What was it you said to him, and what was it he told you?

"A.  Dan Gibbs, the fellow who had him around the neck, was telling me what he had done, his having tried to ravish this little girl.  I asked him, Joe, what in the world did you mean; and he said he did not know?

"I asked him if he tried to do it to this little girl, and he said he did,

that he tried to do it to her without hurting her, and when he found out he was hurting her, he left her alone. I said no more to him, then we carried him down to the bridge to see what would be done with him."

\*        \*        \*        \*        \*        \*

"Q.   What was the object in bringing the defendant to the bridge?

"A.   To Meet Mr. Prosser, and to decide what to do with him.

"Q.   What was the discussion about what you should do with him?

"A.   Whether to carry him to the law, or give him a brushing and send him back to work, or to run him out of the country.

"Q.   What do you mean by a brushing?

"A.   Give him a whipping.

"Q.   Was it not on the advice of Mr. Lesseps that you did not hang him or whip him?

"A.   No, sir, we would not have hung him, but we would have whipped him. We would have let the mob of negroes hang him, and would not have protected the prisoner, but would have protected those who hung him, as we thought he deserved it.

"Q.   Did Mr. Lesseps at length come up and say to the crowd, it is better to let the law take its course?

"A.   Yes, we went for Mr. Lesseps and he came up and said it was better for the law to take its course, but the prisoner wanted us to whip him and turn him loose.

"Q.   Was the rope still around his neck?

"A.   No, sir; not on the bridge, he was turned loose. The negro who had the rope was just leading him around; that is all the rope was tied on him for, he had no pistol or nothing.

"Q.   Was the rope taken off his neck after it was decided not to hang him and let the law take its course?

"A.   No, sir; as well as I can recollect, the rope was taken off before Mr. Lesseps came; in other words it was taken off as soon as Mr. Prosser came and met me on the bridge.

\*        \*        \*        \*        \*        \*

"Q.   A considerable crowd of negroes had accumulated before Mr. Lesseps got there, had there not?

"A.   A good many; yes, sir.

"Q.   Did not this crowd of negroes who had assembled there want to hang Joe?

"A. No, sir.

\* \* \* \* \* \*

"Q. How long did it take the crowd you were in to decide the question whether the negro was to be hanged, whipped or sent to the court house?

"A. I don't know sir, only a short time.

"Q. It never was decided, was it, until Mr. Lesseps reached the scene?

"A. No, sir.

"Q. When Mr. Lesseps said to the crowd that he thought it was better to let the law take its course, then it was finally agreed to turn him over to the law, was it not?

"A. Yes, sir.

"Q. Was there any talk of whipping or lynching or sending him to the court house before the accused party told you how this thing happened?

"A. No, sir; it all took place after. ·

"Q. Did you make him any threats or inducement before, or at the time he told you how it happened?

"A. No, sir.

"Q. Was there any crowd gathered around him or near him at the time he told you?

"A. No, sir.

"By the court:

"Q. As I understand it, where this conversation took place the negro had a plow line around his neck, but no evidence of violence had been offered him. Now, had you said anything, or anybody else done anything calculated to frighten him?

"A. No, sir.

"Q. The plow line had been put around his neck to keep him from running off?

"A. Yes, sir; that is the only way they had to stop him.

"Q. And the statement by him made to you was voluntarily made and not superinduced by fear, nor threats on your part?

"A. Yes, sir."

The following is an extract from the interrogation of another witness:

"Q. Do you know how the rope and why the rope was put around the prisoner's neck?

"A.  As to how it was put around, I don't know, but the reason why —I had turned him over to a man I had working in the yard on some wagon bodies, and merely tied the rope to make him secured; he tied the rope around his neck and I tied him to the wagon where he was working.  That was early in the forenoon and he remained there until late in the afternoon.  Mr. O'Quin returned home then and I merely sent him over to Mr. O'Quin.

"Q.  Did you turn him over to a mob or crowd?

"A.  No, sir; only to one man, who gave him to another man to bring him to Mr. O'Quin.  No mob went from my place to Mr. O'Quin's place with him, there was no mob there; there might have been two or three colored men who went with him.  No white men went, not even myself.

"Q.  Did you take part in the discussion of the question as to what disposition should be made of the prisoner—that is to say whether he was to be hanged, whipped or turned over to the law?

"A.  Yes, before Mr. Lesseps came up, Mr. O'Quin and I had a conversation on the subject, and we decided to give him a whipping and turn him loose, the defendant declaring that he would rather be whipped than sent to law."

The following is an extract from the interrogation of another witness:

"Q.  Have you given your statement orally to the judge in this matter?

"A.  Yes, sir.  About five in the evening a darkey came to me and said that Mr. O'Quin and Mr. Prosser asked me to come up to the bridge.  I went, and when I arrived, I saw a crowd of negroes standing around, and Mr. O'Quin and Mr. Prosser and a few other white gentlemen sitting on the railing of the bridge, near by us was the accused.  Mr. O'Quin related the facts in the matter to me and asked me what I thought would better be done with him.  I asked the darkey if it was a fact that he had attempted to rape the little girl, and he said it was.  *   *   *

"After hearing the negro's reply, I advised that he should be turned over to the law.  He was then taken to a house about one hundred yards from the bridge, and was chained to a post in the house and put in charge of two darkies to await the arrival of the constable.  This was about eight o'clock in the evening.

*          *          *          *          *          *

"Q. Do you think, Mr. Lesseps, while these discussions were going on, whether it was better to hang him, to whip him, or to turn him over to the law, that the situation of the prisoner was very perplexing and embarrassing to him,. and would not have been to you had you been in his fix?

"A. No, sir; because when I arrived on the spot there was no discussion of what should be done.

"Q. When you heard the question put in the crowd, what shall we do with the man, did not that put him in a very embarrassing and perplexing condition?

"A. Yes, sir; if he was guilty; if he was innocent, no.

"Q. Were the people assembled there, friends of the prisoner. or not?

"A. He is a stranger in the parish, and the only friend among the white people he might have had, was Mr. Prosser, his employer, and he may have had some colored friends."

The foregoing is a reproduction of all the salient portions of the testimony, and a careful consideration thereof has brought us to the conclusion that the confession of the accused was not voluntary, but made under circumstances well calculated to inspire fear; and, consequently, same should not have been received; and that the trial judge committed reversible error in permitting it to go to the jury.

The general rule of law, as stated by Greenleaf is, "that the con-" fession shall have been made voluntarily, without the appliance of " hope or fear, or by any other person." Ist Greenleaf on Evidence, Sec. 219.

It is stated by another author that the confession "must not be obtained by the exertion of any improper influence." 3rd Russel on Crimes, p. 478.

The same theory is entertained by other authors.

Wharton's Criminal Evidence, Sec. 673; 2nd Taylor's Evidence, Sec. 8722.

"The law can not measure the force of the influence used, or decide upon its effect upon the mind of the prisoner; and, therefore, excludes the declaration if any degree of influence has been exerted." 3rd Russell on Crimes, p. 478.

In State vs. Berry, 50th Ann., 1309, this court held that before what purports to be the confession of an accused. person can be introduced in evidence against him, it should be shown to have been freely and

voluntarily made, and not brought about by any fear on his part, or inducements held out to him.

That confessions made by prisoners to parties arresting them, or holding them in custody, should be closely scrutinized, in order to ascertain that instrumentalities intended merely for the vindication of the law, should not be converted into engines of oppression and wrong.

In State vs. Auguste, 50th Ann., 488, we held, that the rule of law requires that the confession of an accused shall have been made voluntarily and without the appliance of hope, menace or fear by any other person; and that whether it was so made or not is to be determined upon due consideration of the circumstances under which it was made.

That in order that such confession be admissible, it must apppear that "*the making* of the statement was voluntary."

In State vs. Albert, 50th Ann., 481, it was held, that a confession obtained under duress is altogether inadmissible as evidence against an accused person; and that testimony thus obtained should not be admitted in evidence against an accused.

The facts of the instant case, as we have recited them, make it almost an exact parellel with that of State vs. Albert. State vs. Revills, 34 Ann., 381.

The accused made the alleged confession to a party of private individuals—not officers of the law, or persons authorized to make arrests —who had him in close custody, with a rope around his neck, and under circumstances of intimidation and probable violence. Just prior to the confession the party had under discussion the question of whether he should be hung, or whipped or surrendered to the officers of the law; and this discussion occurred in the presence of the accused. And when the decision was reached that the accused should be surrendered to the officers of the law, he was taken to a house about one hundred yards from the bridge where the discussion took place, and was chained to a post in the house and put in the charge of two darkies to await the arrival of the constable.

In our opinion, argument is unnecessary to demonstrate that the confession was made under the appliance of fear and that it should have been excluded from consideration by the jury.

In State vs. Albert, we said:

"The whole course of proceeding as it is developed in the testimony,

" was altogether irregular, to phrase it as mildly as the circumstances " will allow, and contrary to the usual course of justice;" and much the same may be said of the testimony in this case.

We are clearly of the opinion that the testimony was extorted through fear and intimidation, and should not have been admitted as evidence against the accused.

The ruling of the trial judge was reversible error, and the verdict and sentence must be reversed and set aside.

It is, therefore, ordered, and decreed that the verdict of the jury and the sentence thereon based, be annulled and reversed; and it is further ordered and decreed that the cause be remanded to the court below for trial according to law.