198 So. 910

**STATE v. HENRY.**

No. 35876.

Nov. 4, 1940.

Clement M. Moss and Norman F. Anderson, both of Lake Charles, for appellant.

Eugene Stanley, Atty. Gen., Niels F. Hertz, Sp. Asst. Atty. Gen., and C. V. Pattison, Dist. Atty., and Coleman D. Reed, and John H. Martin, Asst. Dist. Attys., all of Lake Charles, for the State.

HIGGINS, Justice.

The defendant, Mrs. Annie Beatrice Henry, and Finnon Burks were indicted jointly on February 27, 1940, for the murder of J. P. Calloway on February 14, 1940. The accused were arraigned on February 29, and a plea of "not guilty" was entered by counsel who had been appointed solely for the purpose of the arraignment. The case was immediately fixed for trial on March 27. On March 2, it appearing that the defendant was an indigent person, the present counsel were assigned by the court to defend her. On March 15, upon defendant's motion, she was granted a severance from the codefendant, Finnon Burks. On March 23, a motion for a continuance was filed by the defendant upon the ground that her attorneys were inexperienced in handling criminal matters as they had devoted their time almost exclusively to the practice of civil law and that under the circumstances of her case they did not have time to prepare themselves for the trial on March 27. On March 25, the continuance was denied, and, on March 27, counsel renewed their motion therefor but the court again overruled it. The trial began on March 27 and was concluded on March 29. At

about 5:30 p. m. on the latter date, the case was submitted to the jury, and at 10:25 that night a verdict of "guilty as charged" was returned. After the original and supplemental motions for a new trial were denied, the defendant was sentenced to death. She has appealed and presents twenty-one bills of exception as the basis for asking that the verdict and sentence be annulled.

Bills of exception Nos. 1 and 2 were reserved to the trial judge's ruling in refusing to grant a continuance. Both of the attorneys for the defendant testified that they had been engaged in the legal profession for five and fourteen years, respectively, and that they had confined their efforts almost entirely to the practice of civil law and, therefore, it was necessary that they do considerable research work to familiarize themselves with criminal law and procedure in order to gain a working knowledge for the trial; that they had consulted the defendant only once and then for the primary purpose of considering preliminary motions; that a great part of their time was absorbed in pressing civil cases wherein the rights of their clients were in jeopardy and their consideration of these matters could not be postponed; that it was necessary to make an investigation in Beaumont, Texas, and Shreveport, Louisiana; and that additional difficulties and obstacles had been encountered through improper newspaper publicity of the case by the district attorney and the proposed special prosecutor.

The only legal qualification of counsel assigned in a capital case for the defense of an accused is that he shall have at least five years' actual experience at the bar. Article 143, Code of Criminal Procedure. In the instant case, the defendant's attorneys fulfilled that requirement. While it would be better practice, in the trial of capital cases, to appoint attorneys experienced in that particular field, counsel for the defense in this case, by their industry and intelligence, made up for whatever experience they lacked in the actual practice of criminal law. They had about twenty-five days within which to prepare for the trial and, under the jurisprudence as well as the facts of this case, that period of time was sufficient. State v. Wilson, 181 La. 61, 158 So. 621.

It has been held that other professional engagements existing at the time of counsel's employment do not constitute legal grounds for the granting of a continuance. State v. Turner, 122 La. 371, 47 So. 685. Furthermore, under Article 320 of the Code of Criminal Procedure, "* * * granting or refusing of any continuance is within the sound discretion of the trial judge; * * *."

We find nothing in the above bills which would indicate that our learned brother below arbitrarily exercised his discretion in refusing a continuance.

Bill of exception No. 3 was taken to the court's refusal to maintain defendant's objection to the enrolling of J. P. Copeland of Houston, Texas, as a special prosecutor to assist the district attorney in this

case, and to the court's refusal to permit the defendant to examine Copeland with reference to his qualifications.

The record shows that at the beginning of the trial the district attorney introduced Mr. Copeland to the court and requested that his name be entered as a special assistant prosecutor. The defendant's attorneys objected to Mr. Copeland's enrollment until such time as evidence was placed before the court that Mr. Copeland was an attorney-at-law and admitted to the practice of law either in the State of Texas or the State of Louisiana. While the trial judge, in his per curiam, states that Mr. Copeland was an old friend of the family, neither the district attorney nor the judge stated that they knew or had any evidence which would indicate that he was an attorney-at-law qualified to practice before the courts of Texas or Louisiana.

■ Article 17 of the Code of Criminal Procedure grants the district attorney the right to employ or accept the assistance of "counsel" in the conduct of a criminal case but the article expressly limits employment to a "counsel" or an attorney-at-law. This article certainly does not contemplate that the district attorney in the prosecution of a criminal case has the right to employ or accept the assistance of a person who is not a "counsel" or an attorney-at-law.

■ Act No. 202 of the Legislature of 1932, provides certain requisites for the practice of law in this state by visiting counsel, the fundamental qualification being that he must be an attorney-at-law.

■ In the case of State v. Tate, 185 La. 1006, 171 So. 108, we held that a prosecuting attorney must be impartial in conducting a criminal case, since he is a quasi-judicial officer, that he represents the state, and the state seeks justice only, and that it is as much the duty of the district attorney to protect the defendant under his constitutional and statutory rights as it is to see that no guilty party escapes. See, also, Flege v. State, 93 Neb. 610, 142 N.W. 276, 47 L.R.A.,N.S., 1106.

■ Article 7, sections 59, 60 and 61 of the Constitution of Louisiana of 1921, sets forth the qualifications of a district attorney and assistant district attorneys, who are required to have been duly admitted to the practice of law. The defendant was entitled to know if Mr. Copeland was duly qualified to be designated and enrolled as a special prosecuting attorney against her, even though the district attorney and the trial judge were satisfied by Mr. Copeland's statement dehors the record that he was an attorney-at-law. If he was not an attorney, he was not eligible to participate in the trial. As the record now stands, neither the district attorney, the district judge, nor the members of this court know whether Mr. Copeland was eligible and qualified to serve as a special prosecutor in this case. Surely, his participation in the trial cannot be said to be favorable to the accused as he stated in the public press before the trial that he had been employed by the deceased's family to demand only a capital verdict.

In connection with this bill, counsel for the defendant also contended that even

though Mr. Copeland were a qualified attorney in the State of Texas, he was lacking the qualifications as to residence, etc., required of a district attorney or an assistant district attorney under the Constitution and laws of the State of Louisiana to represent the State in the prosecution of the accused, citing sections 59, 60 and 61 of Article 7 of the Constitution of Louisiana of 1921. They have also referred us to the case of State v. Russell, 83 Wis. 330, 53 N.W. 441, where the court decided that under the Wisconsin statute providing for the appointment of "counsel" to assist the district attorney, a resident and attorney from another state was not eligible for appointment in the prosecution of a person for murder and that the appointment of the nonresident attorney to participate in the trial was prejudicial error, entitling the defendant to a new trial.

In Flege v. State, 93 Neb. 610, 142 N.W. 276, 277, 47 L.R.A.,N.S., 1106, the court held, as follows:

" 'Public prosecutors and peace officers owe no greater obligation to the public than to a defendant charged with crime, and they should as zealously protect the one as the other.' This being true and maintained by all courts, it must appear to the mind at once that the appointment of a partisan special prosecutor was not in the interest of the fair and impartial trial guaranteed by the Constitution."

See, also, State v. Tate et al., 185 La. 1006, 171 So. 108; State v. Cato, 116 La. 195, 40 So. 633 and O'Connor v. Parish of East Baton Rouge, 31 La.Ann. 221.

From the foregoing authorities it is apparent that this contention presents a serious legal question but as the record does not disclose Mr. Copeland's qualifications whatsoever, we shall refrain from giving our opinion on this point.

Bills of exception Nos. 4 and 5 were reserved to the district judge's refusal to permit defense counsel to ask the prospective jurors on their voir dire examination questions relative to the possibility of the rendition of a qualified verdict in the event of conviction, counsel having informed the court that the questions were necessary to determine whether or not the jurors were qualified, in order that either a challenge for cause or a peremptory challenge might be intelligently exercised. After the district attorney had asked two of the prospective jurors if they had any conscientious scruples against the infliction of capital punishment, they answered in the negative. Counsel for the defense, for the purpose of ascertaining if two of the prospective jurors would return a capital verdict only, propounded the following questions: To Charles Quirk: "When you retire to the jury room if you feel that under all of the circumstances of the case that guilty without capital punishment is a fair thing you won't hesitate to bring such a verdict will you?" And to W. D. Duplechain: "I want to ask you if she is proven guilty if you could also vote for a verdict of guilty without capital punishment, but [or] imprisonment for life?" (Brackets ours.) Counsel for the state objected to both of these questions and the objections were sustained in each instance,

and the court limited the defendant's inquiries by stating "you may ask the question if he will take the law as the court gives it to him." Mr. Quirk was accepted as a juror and participated in the trial. Mr. Duplechain was challenged peremptorily by the defendant, who thereafter exhausted all of her twelve peremptory challenges prior to the qualifications of the twelfth juror.

The trial judge, in his per curiam, states:

"The form of the question in the opinion of this court is manifestly improper. The prospective juror might have been asked with equal propriety if he would hesitate to bring in a verdict of acquittal, etc., if he felt that under all the circumstances such a verdict was fair."

The learned trial judge appears to have lost sight of the essential difference in the verdicts mentioned. The juror is bound by his oath to base a verdict of "not guilty," "guilty of manslaughter," and "guilty," solely upon the law and evidence, without regard to his own feelings and sense of fairness. However, in capital cases, it is entirely left to the jury to determine the extent of the punishment in the event of conviction. The jurors, in such cases, are entirely free to choose between a qualified and an unqualified verdict, because the law gives them the unquestioned discretion to return either one or the other. While the trial judge is granted latitude as to what questions may or may not be answered on a voir dire examination, this discretion is subject to essential demands of fairness. Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054, 73 A.L.R. 1203. The examination cannot be limited so as to destroy or impair the constitutional and statutory rights of challenge for cause and peremptory challenge. A juror does not stand impartially between the state and the defendant if, in murder cases, he has such a prejudice against imprisonment for life as will prevent him from voting for a qualified verdict, or if he believes that only a capital verdict is a proper one in murder cases.

In 35 C.J., page 354, it is stated:

"A juror is incompetent who is so opposed to a particular form of punishment that it would influence his verdict, or who has such opposition to applying the form of punishment prescribed by statute to the particular offense with which defendant is charged. Conversely a juror who, in the event of conviction for murder in the first degree, would render no other verdict than one which would require capital punishment, or who would not under any circumstances accord accused the benefit of the suspended sentence law, is subject to challenge." Fernandez v. State, 82 Tex.Cr. 129, 198 S.W. 301; Stroud v. United States, 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317.

We find in 35 C.J., pages 387, 405 and 406, the following:

"While there are a few decisions to the contrary, it is held in most jurisdictions that parties have a right to question jurors on their examination not only for the purpose of showing grounds for a challenge for cause, but also, within reasonable limits, to elicit such facts as will enable

them intelligently to exercise their right of peremptory challenge, and that it is error for the court to exclude questions which are pertinent for either purpose. * * *

"* * * The right of peremptory challenge is a substantial right, and and its freest exercise should be permitted. * * * The right * * * includes * * * and to have them sworn on their voir dire, and subject them to such examination as will enable the party to exercise the right intelligently." See also United States v. Clark, D.C., 1 F.Supp. 747, and Donovan v. People, 139 Ill. 412, 28 N.E. 964.

The above rules have been applied in this state and interference by the court with the free exercise of these rights has not been countenanced.

In the case of State v. Guidry, 160 La. 655, 107 So. 479, 480, this court set aside a conviction, even though the defendant had not exhausted his peremptory challenges, because of the refusal of the trial judge to permit the defendant's attorneys to put questions directly to the prospective jurors. The refusal of the trial court was based upon its rule that "Examination of jurors on their voir dire shall be conducted exclusively by the judge presiding, reserving to counsel the right to suggest questions to be propounded, to object to questions propounded, and to except to rulings on said suggestions or objections." Although there was no statute prescribing the manner of conducting the examinations, it was held that the method provided by the trial court's rule was in derogation of the accused's rights of peremptory

challenge under Article 1, par. 10, of the Constitution of 1921, the court stating:

"* * * The right of peremptory challenge is not a right of selection, but a right to reject. In order to intelligently exercise the right, an accused is entitled, through his counsel, to a reasonable examination of the juror to ascertain the facts as to his competency. The effect of the rule adopted by the district court is to render the right of peremptory challenge unavailing * * *." See, also, State v. Ferguson, 187 La. 869, 175 So. 603.

It is our opinion that the questions propounded to Messrs. Quirk and Duplechain were not improper but were framed for the purpose of ascertaining if they had any prejudice against rendering a qualified verdict in a murder case, or if they only favored the death penalty in such a case. To be impartial jurors in this case they should have been free of any scruples or personal opinions which would have prevented them from imposing either the death penalty or life imprisonment. If they had conscientious scruples against the infliction of capital punishment they were subject to challenge for cause by the state. Article 352, Code of Criminal Procedure. If they would impose only the death penalty in a murder case they were likewise subject to challenge for cause by the defendant. This was not an effort to show that they were personally biased or prejudiced against the defendant nor was it an attempt to commit them in advance to a qualified verdict, but counsel, through their examination, were endeavoring to ascertain whether or not the penalty of death,

was the only punishment these prospective jurors considered proper and adequate in murder cases. The trial judge's refusal to allow defendant's counsel to go further than to ask the juror "if he would take the law as the court gives it to him," was based upon the erroneous belief that the jurymen's choice between a qualified and an unqualified verdict must be grounded upon the application of law as given by the court. But the law gives jurymen in murder·cases an absolute discretion as to which form of punishment will be inflicted upon the accused if found guilty. The trial judge's ruling made it impossible to elicit the necessary information from these two gentlemen tending to show their qualifications as impartial jurors in a murder case with reference to the ultimate punishment to be inflicted in the event of a verdict finding the defendant guilty. Therefore, the accused was deprived of the opportunity, which she was entitled to, to intelligently exercise her constitutional right of peremptory challenge and challenge for cause.

Bills of exception Nos. 7 to 12, inclusive, were reserved to the ruling of the court in holding that the state had affirmatively shown that the confessions of the accused were free and voluntary and were not made through inducements or promises.

The state first offered, in connection with laying the foundation for the admission of the confessions, the statements made by the defendant to her paternal aunt, Mrs. Emma Holt. She testified that her 24 year old niece came to her home near Shreveport in an extremely nervous condition and upon inquiring what was the matter, the defendant stated, "I shot a man"; that thereafter, upon the promise of Mrs. Holt that she would do all in her power to help her niece and would also endeavor to get her brother, Captain George D. McQuistion, third ranking officer in the State Police of Louisiana, and the defendant's paternal uncle, to help the defendant so that she would go' to the penitentiary and would not be hanged if she told her the whole truth about the killing, that the accused, thereupon, told Mrs. Holt the circumstances and the details of the killing and Mrs. Holt then caused the arrest of the accused through Captain McQuistion. The defendant objected to the admission of the confession on the ground that the foundation was not only insufficient but that the witness' testimony affirmatively showed inducements and promises to help the accused were made by saying, "we will try to keep you from hanging."

The court ruled that, as the defendant had told her aunt that she had "shot a man" before any promise was made or inducement was offered and as only the details of the crime were later related, the confessions were affirmatively shown to have been freely and voluntarily made. The statement "I shot a man," standing alone would not incriminate the defendant, as the killing might have been accidental or justified. Furthermore, the aunt did not even know what man the defendant was claiming to have shot. The incriminating statements or confessions of the defendant were not ·made to her aunt until she had promised her help and the assistance of Captain McQuistion to prevent her execution.

■ ■ Article 451 of the Code of Criminal Procedure reads:

"Before what purposes [purports] to be a confession can be introduced in evidence, *it must be affirmatively shown that it was free and voluntary, and not made under* the influence of fear, duress, intimidation, menaces, threats, *inducements or promises.*" (Italics and brackets ours.)

If there were any reasonable doubt that the confessions of the accused were free and voluntary, they should have been excluded. 20 Amer.Juris., Evidence, par. 538, and State v. Garvey et al., 25 La.Ann. 191. The law cannot measure the force or effect of the influence upon the mind of the accused, and therefore excludes the declaration if any degree of influence has been exerted. State v. Young, 52 La.Ann. 478, 27 So. 50; Bram v. United States, 168 U.S. 532, 549, 18 S.Ct. 183, 42 L.Ed. 568.

In the case of State v. Young, supra, where a confession was given to a mob, it was held:

"The rule of law demands that the confession of an accused shall have been made voluntarily, and without the appliance of hope or fear by any other person; * * *." See also State v. Doiron, 150 La. 550, 90 So. 920, where the confession was made to a doctor, and State v. Revells, 34 La. Ann. 381, 44 Am.Rep. 436.

In Johnson v. State, 89 Miss. 773, 42 So. 606, the court held that the defendant's confessions made to private citizens after one of them had promised to· intercede with the judge for a light sentence and had also informed the defendant that it would be better to confess, as it would go lighter with him if he told the truth, are inadmissible.

The other five confessions were introduced in evidence against the defendant by police officers, over her objections, and after they had stated that they had made no promise or inducement to the defendant. These same state witnesses, however, testified that they did not know whether or not any promise or inducement had been made by Captain George D. McQuistion, third ranking state police officer and paternal uncle of the defendant. Two of these witnesses, D. B. Walker and J. L. Atkins, state police, testified that they took the defendant into custody, under the instructions of Captain McQuistion, at the home of defendant's aunt, Mrs. Emma Holt, on the Mooringsport Road near Shreveport, and delivered her to Captain McQuistion at Bossier City; that the defendant did not make any incriminating statements to them prior to the time she went into the room alone with her uncle, but that after she had talked privately with him for sometime, she came out of the room, and then, upon her uncle's instructions, told them the details and circumstances of the killing of Mr. Calloway, for whose murder she is charged.

The state did not place Captain McQuistion on the stand at any time, although it had previously issued a subpoena for him, and in spite of the fact that the records showed that the subpoena had not been served and he was not present in the court room, the state insisted that it was ready for trial and objected to the con-

tinuance of the case, on the previous motion of defendant's counsel.

Counsel for the defendant objected to the introduction of the police officers' testimony relative to the confessions, on the ground that it was not shown that there was a cessation of the aunt's prior influence through inducements and promises. They further contended that under the law it was necessary for the state to affirmatively show that Captain McQuistion did not influence the defendant through inducements to relate the story of the killing to himself or the police officers.

None of the five police officers was able to state that Captain McQuistion did not through promises or inducements influence the young woman to confess. In short, their testimony in that respect is purely negative.

Is such proof adequate to comply with the requirements of Article 451 of the Code of Criminal Procedure that before the confession can be admitted, the state must affirmatively show that the confession was voluntarily made and not made through inducements or promises?

 In the case of Ziang Sung Wan v. United States, 266 U.S. 1, 45 S.Ct. 1, 3, 69 L.Ed. 131, it was stated:

" * * * the requisite of voluntariness is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was, in fact, voluntarily made."

In State v. Auguste et al., 50 La.Ann. 488, 23 So. 612, 613, it was held:

" * * * With regard to the question of proof to show that a confession was or was not voluntary, the rule is not that in order to render a statement admissible, the proof must be adequate to establish that it was voluntarily made, but it is that it must be sufficient to establish that the making of the statement was voluntary. See Brem v. United States, 168 U.S. 532, 549, 18 S.Ct. 183 [42 L.Ed. 568]."

 As Mrs. Holt, the State's witness, testified that she had made promises and offered inducements to the accused to obtain the confessions, and thereafter caused her arrest through Captain McQuistion, and, as the police officers themselves stated that Captain McQuistion spoke to the young woman alone for some time, before he instructed her to tell them of the killing, it appears to us that the state has failed to affirmatively show that the confessions were free and voluntary and not made through inducements or promises, because the state did not show that there was a cessation of the aunt's influence on the accused and also completely failed to show that Captain McQuistion (who was not even offered as a witness) did not make any promise or in any way induce the accused to confess to him and his fellow police officers. If the prosecuting attorney is permitted to lay the foundation for the introduction of a confession as was done in the instant case, it would be a simple matter to have one of the police officers or an official influence a defendant through fear, duress, intimidation, menace, threats, inducements, or promises to confess to other

officers or officials, who would testify that the confession was made to them free and voluntary, and he could then keep that particular officer or official from testifying as to the influence exerted on the accused. If such procedure were allowed, the provisions of Article 451 of the Criminal Code would, in effect, be made to read that the state can either affirmatively or negatively show that the confession was free and voluntary and not made through threats, etc., and thereby make the article absolutely impotent by shifting the burden of proof from the state to the defendant.

■ In the case of State v. Murphy, 154 La. 190, 203, 97 So. 397, 402, the court said:

"The law presumes, once a showing has been made that an accused confessed through fear or the promise of relief, that such condition of mind continues at any subsequent confession, unless it be proven that by the lapse of time, and by the circumstances under which it was made, the act of the prisoner was entirely free and voluntary. State v. Wood, 122 La. 1014, 48 So. 438, 20 L.R.A. (N.S.) 392."

■ It is argued that even though the confessions were inadmissible through lack of proper foundation, there was other evidence consisting of the accused's own testimony sufficient to justify the conviction and, therefore, the defendant suffered no prejudice.

In the case of State v. Murphy et al., 154 La. 190, page 203, 97 So. 397, page 402, this court rejected such a contention by stating:

"There might have been sufficient evidence to have convicted the defendants without it (the confessions), including their own statements on the stand; but that was a matter for the jury to determine, under the Constitution, and we are bound to assume that the evidence thus illegally put before them prejudiced the rights of the accused." (Parenthesis added.)

In the case of People v. Loper, 159 Cal. 6, 112 P. 720, 726, Ann.Cas.1912B, 1193, the court said:

"And it is equally untenable to say that, because the prosecution had a perfect case without the confession, the jury would have imposed the ultimate penalty of the law upon the defendant, whether that confession had been excluded or admitted. No one could say (not even the jurors themselves) just what weight the confession had in fixing the belief of the jury in Loper's guilt, and especially in shaping a verdict involving capital punishment. But every one must conclude that the introduction of the defendant's own statement of his guilt under the circumstances here shown must have been most highly prejudicial to him. It follows that for this reason a new trial must be ordered."

The use of which the state made of the alleged confessions of the defendant precludes it from now saying that they were not used to the prejudice of the accused. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568.

It is our opinion that the foundations for the introduction of the confessions were not affirmatively laid and, therefore,

the defendant was deprived of substantial rights by their admission in evidence. State v. Chiasson, 174 La. 542, 141 So. 54; State v. Phelps, 138 La. 11, 69 So. 856.

Bill of exception No. 14 was reserved to the court's ruling sustaining the state's objection to the testimony regarding the defendant's life history, particularly as to her environment. Counsel for the accused, at the time, stated that the purpose of this evidence was to show that the defendant was a child of misfortune and a victim of circumstances, and that the evidence was pertinent and relevant, particularly as the jurors were the sole judges and had the absolute discretion as to the extent of the punishment—hanging or life imprisonment.

The record shows that when Mrs. Holt, the defendant's aunt, was on the stand as a state's witness, she testified under cross-examination that the accused's mother died when defendant was four years old and that she had taken care of the child until she was almost fourteen years of age; that the child ran away from home because her father was cruel to her; and that she married at the early age of seventeen, and subsequently, lived as a lewd woman in Shreveport, Louisiana. The state first objected to this evidence unless its purpose was to show bad reputation, and then withdrew its objection. However, when the accused was on the stand under direct examination, the state objected to any testimony along the lines given by the aunt with reference to the defendant's past life. The record shows that the judge pointed out to the district attorney that while this evidence may be immaterial or irrelevant on the question of guilt or innocence of the accused on the charge of murder, it appeared to him that it was pertinent on the question of the extent of the punishment the jury would impose in the event the accused was found guilty. After a great deal of argument by counsel on both sides, the court sustained the state's objection and excluded the testimony.

As the jurors were the sole judges and had the absolute discretion to impose either the death penalty or imprisonment for life in the State Penitentiary at hard labor if they concluded that the accused was guilty of murder, the testimony of the defendant relative to her environment and hardships throughout her childhood and early womanhood was relevant and admissible only on that score. This is particularly so where the state permits a part of the defendant's life history to go into the record unobjected to, and then, subsequently objects to the narration of the remainder thereof. Criminal Code, Article 442; 16 C.J. 884 and 22 C.J. 195.

Bills of exception Nos. 6, 13, 16, 19, 20 and 21 were reserved to the judge's refusal to direct a mistrial on account of extraneous influences upon the jury. Bill No. 6 covers the trial judge's ruling in permitting the widow and the minor daughter of the deceased J. P. Calloway to sit with the state's counsel and within 10 feet of the jury for the publicly announced purpose of arousing the sympathy of the jury in aid of the state's case, notwithstanding defendant's timely objection thereto.

The record shows that immediately after the jury had been completed and sworn, but before the opening statement by the district attorney, the proceedings were interrupted by the opening of a rear door of the courtroom just behind the witness' stand and within about 15 feet and in clear view of the jurors and by the court attachés bringing in two chairs and causing the district attorney and his assistants to move their chairs to make room for Mrs. J. P. Calloway and Miss Lita Calloway, the widow and the seventeen year old daughter of the deceased Calloway, who were escorted to the chairs by J. P. Copeland, special assistant district attorney or prosecutor, named as such over the prior objection of the defendant's attorneys; that these parties remained seated in full view of the jury and immediately facing the jury box during the remainder of the trial; that counsel for the defendant requested the court to have them seated outside of the rail, but the court also refused this request, and counsel, then, in connection with this bill of exception, introduced a copy of the Beaumont Enterprise and the Lake Charles American Press, daily newspapers, which contained statements made by the special prosecutor, J. P. Copeland, previous to the trial, to the effect that the widow and daughter of the deceased, who were elegant people, would be brought to the trial for the purpose of arousing sympathy for them and overcoming any favorable sentiment in behalf of the young woman accused, and that it was his purpose to demand that the defendant be hanged as no other punishment would be adequate or sufficient. The special prosecutor, although being present in the courtroom, did not deny defense counsel's accusations, which were supported by his statements quoted from the newspapers. It also appears that some of the jurors, when examined on their voir dire, admitted having read the statements in the newspapers.

In the case of State v. Broughton, 158 La. 1045, 105 So. 59, it was held that the fact that the deceased left a family is irrelevant and evidence to show such fact is inadmissible. The state, therefore, was permitted, over the defendant's objection, not only to accomplish indirectly what it could not do directly, but also, for all practical purposes, to virtually introduce the widow and daughter into the evidence before the jury, and furthermore, had the benefit of the family's continuous, even though silent, plea to the jury for the "hanging verdict" which the widow and daughter, through their special counsel, Mr. Copeland, stated they wished to obtain as retribution for the loss suffered by them.

In the case of Hammond v. State, 26 Ala.App. 391, 160 So. 900, the court held that as the defendant is entitled to a trial free of any extraneous influences that might be to the prejudice of the rights of the accused, it is the duty of the court to see that such extraneous influences on the jury are eliminated. Sylvester v. State, 205 Ind. 628, 187 N.E. 669.

In the case of Swindle v. State, 27 Ala. App. 549, 176 So. 372, 373, the court stated:

"The indictment in this case was for murder in the first degree. On the trial

the jury returned a verdict of manslaughter in the first degree; thus, rendering unnecessary a consideration of any ruling of the court referable only to murder in the first or second degree.

"At the beginning of the trial and after the jury had been placed in the box, and before the statement of the case to the jury by the solicitor, Mr. Henry Mayfield, special prosecutor in the case, was followed by the wife and the five small children of the deceased into the courtroom, and in an audible voice requested all those seated near the counsel table to make room for them. He thereupon in the presence of the jury seated the wife and her small children at the counsel table, directly in front of the jury, and within the bar of the court. Thereupon counsel for defendant stated to the court: 'Your Honor, we object to the family of the deceased being within the bar.' The court in reply said: 'Those parties not taking part in the case will move from the table.' Before proceeding further, the jury was caused to retire. Whereupon counsel for defense moved for a mistrial. Assigning for grounds for the motion that the five young children of the deceased had been brought into the counsel table with the prosecuting attorneys around them, and that the only purpose and result of such display would tend to prejudice the minds of the jury. Thereupon, at the suggestion of the court, the five children took seats just outside the bar, after the prosecuting attorney had asked occupants of the front seats to move. Whereupon he placed the children in the vacated seats.

"This was all done while the jury had retired, but after the children had first been led to the table of the prosecution in the presence of the jury, and after removal from the bar they were placed on the front seat in the courthouse, in plain view of the jury after it returned. The court then overruled the defendant's motion for a mistrial, to which exception was taken.

"There can be no doubt that the act of the prosecuting attorney in ostentatiously producing the widow and five small children of the dead man at the table of the prosecuting attorneys inside the bar and in the presence of the jury was an effort on his part to create an atmosphere of sympathy in the trial for the family of the dead man, and a prejudice in the minds of the jury in a way and manner not warranted by the evidence. If the widow and small children had not been in the courtroom, it could not have been proven that the dead man left a widow and five small children; and the act of the prosecuting attorney was an effort to get this evidence before the jury in an illegal way. But, the question here raised seeks to review the action of the trial judge in a matter touching and affecting his discretion, which may not be done unless it be made to appear to this court that there was an abuse of such discretion to the substantial injury of the defendant's cause.

"The object and purpose of all trials is to see that the parties litigant receive a fair and an impartial trial before a jury, without any outside influence not justified by law. In accomplishing this purpose, the duty rests upon the trial judge, and to him

must, of necessity, be committed matters of discretion which may not be reviewed unless it be made clearly to appear that his discretion has been abused. In the instant case we cannot so declare. While we expressly do not approve of the method used by the prosecuting attorney to present illegal matters before the jury in the way and manner in which it was done, none the less, the trial judge had the opportunity of observing the whole situation, and taking into consideration the subsequent verdict of the jury, we decline to review the action of the trial judge in permitting the children of the deceased to be seated in the courtroom during the trial. Pollard v. State, 12 Ala.App. 82, 68 So. 494, Cody v. State, 24 Ala.App. 499, 137 So. 318.

"In matters of this kind arising in trials involving great human interest, trial judges should be careful to see that no extraneous influences are injected into the proceedings, in such way and manner as to bring themselves into a consideration by the jury when it comes to make up its verdict."

The Swindle case, supra, differs from the one at bar in the following important respects:

1. In that case the intention to prejudice the jury was inferred, but in this case it was publicly announced by the special prosecutor; (2) there the trial judge disapproved of such tactics and caused the family to sit outside of the rail; here the trial judge approved of and permitted the family to remain with counsel inside of the rail; (3) Swindle was convicted of manslaughter only and the defendant in

this case was sentenced to death. In the Swindle case, the court expressly stated that it took into consideration the subsequent verdict of the jury, which was for manslaughter only, in declining to review the matter.

In Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 633, 79 L.Ed. 1314, Mr. Justice Sutherland, in referring to the district attorney, said:

"* * * He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Article 1 of the Code of Criminal Procedure expressly provides that persons injured as a result of a crime are not parties to the criminal proceeding.

 It is argued by the state's attorneys and stated in the judge's per curiam that the widow and her minor daughter made no demonstration before the jury. The record shows, however, that the special prosecutor, in his argument before the jury, pointed to them and discussed the great sorrow that had befallen them and of their perfect happiness before the killing. While it is true that the widow and minor daughter of the deceased did not make any scene or outcry in the courtroom, it cannot be said that the attorney employed by them to assist in the prosecution did not stage an exhibition by referring to them as the

sorrowful bereaved relatives of the deceased when neither one of them took the stand to testify nor could they have done so for that purpose. While it is true the defense counsel did not object to Mr. Copeland's demonstrations, they had previously objected to his participation in the trial and also to the demonstration made by him in placing the widow and daughter immediately facing the jury inside the bar or rail of the court. These extraneous circumstances and influences were prejudicial to the substantial rights of the accused.

Bills of exception Nos. 13, 16, 19, 20 and 21 cover the alleged misconduct of spectators and bystanders as extraneous influence which prejudiced the jurors against the accused. The specific acts of misconduct, which are said to have created prejudice, and the members of the jury who saw the acts and heard the words are as follows:

(1) During the selection of the jury, Adam L. Vincent saw a person in the courtroom making a "hanging" motion by running the hand or finger under the throat; (2) during the argument to the jury by one of the defendant's attorneys, R. Rau saw a woman, 8 or 10 feet from him, making a hanging sign by the same motion; (3) during the course of the trial, after the entire jury was selected and while the jury was being taken over the public street for a meal, E. H. Wingate, on two different occasions, saw persons making hanging signs with their hands while looking at them; (4) during the course of the trial, after the entire jury was selected, and while the jury was being taken over the street for a meal, George D. Neely heard a woman call out in a loud voice, "hang her"; and (5) during the course of the trial and after the entire jury was selected and while the jury was being taken over the street for a meal, C. B. Melancon heard a woman, about 50 feet away, call out "hang that bitch."

The defendant's counsel did not have an opportunity to observe any of these acts of misconduct because their backs were turned to the audience in the courtroom and they did not accompany the jury on the streets, but they called the court's attention to them in a motion for a new trial. They also made proper objection to the fact that spectators had overcrowded the courtroom to the extent that the aisles, doors and passageways were fully occupied and that the only available space was a small area between the counsel tables and the jury box; that some of the spectators were standing on seats and causing considerable disturbance from time to time; that after the first day of the trial, the judge closed the door of the courtroom but permitted spectators to stand in the aisles and around the counsel tables and on a large blackboard frame at the end of the courtroom inside the rail, while others were seated immediately adjacent to and leaning on the jury box, on the steps leading to the judge's bench, around the bench, and in chairs to the rear of and adjacent to the witness stand, and that one small boy was sitting on the steps of the jury box. It also appears that when the twelfth juror was accepted by both sides the spectators in

the courtroom applauded loudly and the judge reprimanded them for their misconduct; and that at certain times the crowd inside the rail was so large it was impossible for defense counsel to see some members of the jury.

The judge, in his per curiam, states that there were probably 150 people within the courtroom rail or bar and as it was a public trial, they had a right to attend; and that he had stationed deputies in the courtroom and they had succeeded reasonably well in maintaining order, but that he was powerless to prevent some demonstrations.

In connection with the motion for the new trial, four of the jurors who heard the statements and saw the demonstrations above recited were permitted to testify that they were not in any way influenced thereby and that they based their verdict upon the law and the evidence in the case. One of the jurors stated that during the time flashlight pictures were being taken by photographers of the press, he failed to hear some of the words of defendant's counsel's argument and it was necessary to have it restated.

██ The universally recognized rule is given in 26 American Jurisprudence, page 496, as follows:

"The judge presiding over the trial of a homicide case is charged with the duty of maintaining order, guarding the rights of the defendant, and seeing that the issues are presented to the jury in such a way that the jurors will not be swayed by prejudice. * * *"

See, also, 16 C.J. 810.

██ We realize that there may be isolated instances of misconduct of spectators and bystanders happening in the courtroom, but the judge who presides over the trial of a criminal case has the authority to punish by contempt of court proceedings those who are guilty of such offenses.

██ In the instant case, although quiet was demanded on several occasions and repeated requests for elimination of the crowded condition of the courtroom were made, these conditions continued and even though there were hostile demonstrations, no one was punished for contempt.

We have no doubt that the rights of the accused were prejudiced by the extraneous influences of the misconduct of the spectators and bystanders upon the jurors, nor do we have any doubt that the jury was prejudiced by extraneous influences consisting of the misconduct of the spectators and bystanders. Furthermore, the question of what effect the misconduct and the demonstrations of the bystanders and spectators had on the jurors is for the court to decide and not for the members of the jury to pass upon, for a juror is competent to show misconduct but not how that influence operated on his mind. 16 C.J. 1240. See, also, People v. Chin Non, 146 Cal. 561, 80 P. 681; Woodward v. Leavitt, 107 Mass. 453, 466, 9 Am.Rep. 49; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, and United States v. Ogden, D.C., 105 F. 371.

██ In People v. Chin Non, supra, it was held that upon misconduct being

shown, the jurors cannot be heard to deny its prejudicial influence. In Mattox v. United States and United States v. Ogden, supra, it was held that the court should decide the effect of the extraneous influence upon the jury. It was, therefore, error for the trial judge to substitute for his own opinion the conclusions of the jurors as to the effect and influence that the extraneous misconduct of bystanders and spectators had on them.

 Bill of exception No. 15 was reserved in connection with the alleged improper and intemperate arguments made by the first assistant district attorney. As stated by the trial judge, the real issue before the jury was whether or not the death or life imprisonment penalty should be inflicted. In the opening argument, the state's attorneys asked for a capital verdict pointing out that only the death sentence would be a just punishment of the defendant. Counsel for the defendant in their argument pleaded for mercy and pointed out that imprisonment in the State Penitentiary at hard labor for the remainder of defendant's life would be adequate punishment and that the jurors were the sole judges of whether or not they would impose the death penalty or life imprisonment.

In order to show that a limited or a qualified verdict of guilty without capital punishment would not necessarily place the defendant in the penitentiary during the natural remainder of her life, the assistant district attorney stated:

" * * * in a case which I prosecuted in the Northern end of this District, a man was convicted of a cold-blooded murder. An innocent girl was sitting at the same table with him, and he suddenly leaned across and slashed her throat and the life-blood gushed out, and as quickly as is possible to do so her soul had gone to join her father. He was sentenced by Judge Porter to life imprisonment and now, four years later, he is out and enjoying this fine weather up in the little Town of Oakdale * * *."

" * * * I am certainly arguing that life imprisonment does not mean what it says. A man in Oakdale was convicted for life imprisonment and is now out four years later enjoying the freedom of Oakdale, after conviction for murder."

" * * * as I was saying when interrupted you all know as well as I do that life imprisonment does not mean that. I am giving you an example of it, and you all no doubt know of many others. Through the functioning of our Parole Board and Boards of Pardon, and politicians, principally, particularly in Louisiana. I am not criticising those laws, they are good in some cases, but gentlemen of the jury these Boards do not have the opportunity to pass on the facts of the case like you do. So we can eliminate the possibility of later injustice by following what the law clearly tells you you have a right to do, and that is to find this defendant guilty as charged."

" * * * over there a woman and her lover ruthlessly murdered her husband and sunk him in a lake, but their primary object was murder and was animated by a natural human emotion, although it was

wrong. But look at the case at Bar, which was not animated by a natural human emotion, but that man was ruthlessly shot down while he was praying to his Maker, after he begged for his life. Not because they had anything against him, no, merely because he was an incident of their primary scheme to commit robbery and possibly several more crimes. It is dangerous to risk turning this defendant loose on society in possibly three or four more years. Take her away permanently. Take her away so there will no longer be any necessity to fear such a .thing. She is dangerous as a poisonous snake. Show the people in this Parish and State that you have the courage to follow the law and bring in a verdict of guilty as charged."

Counsel for the defendant immediately objected to this argument and asked that a motion for a mistrial be granted on the ground that this was reversible error. The district judge merely instructed the assistant district attorney to keep within the record and stated that he did not think that the argument amounted to a fatal error. Whereupon, the assistant district attorney made the statement, "I will assume responsibility for my remarks."

Article 381 of the Code of Criminal Procedure reads, as follows:

"Counsel may argue to the jury both the law and the evidence of the case, but must confine themselves to matters as to which evidence has been received, or of which judicial cognizance is taken, and to the law applicable to the evidence; and counsel shall refrain from any appeal to prejudice."

In the case of State v. Johnson, 151 La. 625, 92 So. 139, 142, the court set aside the verdict and sentence and remanded the case for a new trial, Johnson having been convicted of murder and sentenced to be hanged. In asking for the death penalty there, the assistant district attorney stated that the law permitting a qualified verdict was a farce or rather a fiction of law. As in the case at bar, the general charge of the judge did not cover the subject of the remarks of the state's attorneys in the argument before the jury. We quote from the opinion:

" '* * * It only means that the defendant would be sentenced to serve his natural lifetime in the penitentiary and history shows that, after a short period of time, say 5, 10, or 15 years, he would be turned loose again on society There are no mitigating circumstances in this case shown by the evidence. In other words, all the evidence of the case shows that the murder was committed in cold blood. That, therefore, this defendant should receive the extreme penalty of the law and suffer death.'

\* \* \* \* \*

"In the exercise of this power the jury should be left free and untrammeled and should not be influenced by the personal opinion of the prosecuting officer as to the wisdom and expediency of the law, and the effect which, in his opinion, would result from a qualified verdict. No one will question the propriety of the district attorney in arguing to the jury that the evidence made out a case of murder, and apply for an unqualified verdict. But when

he goes beyond this, and gives as a reason why such verdict should be rendered, that would send the accused to the gallows, his personal opinion that the law which authorized a qualified verdict was a farce and meant nothing, he transcended the bounds of legitimate and proper argument."

In the instant case, the state argues that its representative did not say the parole and pardon laws of Louisiana were a farce as was stated in the Johnson case. Nevertheless, counsel did say that the administration of the law by the parole board and the board of pardons, in effect, was a farce, because politicians manipulating the boards often secured the parole and freedom of convicted murderers before they had served a sufficient part of their sentence. It is our opinion that the Johnson case is indistinguishable from the case at bar.

▬▬▬ Counsel for the defendant, in connection with this bill of exception (No. 15), pointed out that when Mr. Copeland, as special prosecutor, was arguing the case before the jury, he discussed the great sorrow brought upon the widow and minor daughter of the deceased and referred to the happiness of the family before the father's death and the gloom and misery of the survivors thereafter. In demonstrating his point, he picked up a glass of water and after calling attention to the fact that it was perfectly clear, discharged the contents of a fountain pen into it, saying that the happy life of the family was like the pure water and that the polluted contents were representative of the fam-

ily's future, which had been blackened by murder.

It was stated in the case of State v. Jones, 51 La.Ann. 103, 24 So. 594, that where a prosecuting officer abuses the privilege of argument to the manifest prejudice of the accused, even if the defense counsel fails to make objection, it is the duty of the trial judge to interfere, and that in the instant case the trial judge did not interfere, even though he knew that counsel for the defendant had pleaded their unfamiliarity and inexperience with criminal law as a reason for a continuance of the case. Special counsel for the prosecutor plainly went out of the record in referring to the surviving relatives of the deceased (and this is especially harmful where that type of evidence is inadmissible), and he therefore indirectly placed before the jury what he could not put before it directly. State v. Broughton, 158 La. 1045, 105 So. 59; Swindle v. State, supra; State v. Thompson, 106 La. 362, 363, 30 So. 895; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

In the court's opinion, the errors committed in the trial of this case were prejudicial to the substantial rights of the accused in varying degrees. Whether or not any one of them standing alone would be sufficient reason to conclude that the rights of the accused had been prejudiced to the extent of requiring an annulment of the verdict and sentence and the granting of a new trial is of no moment, because after taking into consideration the serious prejudice that the substantial rights of the accused suffered as a result of all of these

errors, no one could reasonably say that the verdict and the sentence were lawfully obtained.

For the reasons assigned, it is ordered, adjudged and decreed that the verdict of the jury and the sentence of the court are annulled and set aside a new trial granted, and the case is remanded to the lower court for further proceedings consistent with the views herein expressed.

ODOM, Justice (concurring).

I concur in the ruling that the verdict and sentence should be set aside and a new trial granted in this case. The record brought up shows to my entire satisfaction that the accused did not have the benefit of the kind of trial guaranteed to all accused persons by the Constitution and statutes of this state.

This appeal presents a question of vital importance in the administration of justice, which question relates to the right of a person charged with a crime to have his guilt or innocence, and the pleas and points which he presents and stresses at the trial, determined in the manner prescribed by law. The fundamental rule, which rests upon the clearest and strongest principles of justice and which is safeguarded in most imperative language by the Constitution and laws of this state, is that in all criminal prosecutions an accused person is entitled to a fair and impartial trial and to a verdict based solely on the law and the evidence; a verdict based solely upon the independent judgment of a jury, reached calmly and deliberately after a dignified and orderly trial according to the due

processes of law; a verdict not influenced in the slightest by public sentiment or the feelings and emotions of aggrieved persons, or the insistence of overzealous— even though conscientious—counsel for the prosecution. And above all, in order that the defense interposed and the pleas made may be impartially and calmly considered, it is necessary that the jury should have the opportunity of deliberately weighing the evidence and the pleas without having their minds distracted and dominated by manifestation of public hostility and animosity against the accused person.

My reason for concurring in the decree setting aside the verdict in this case is based mainly—but not solely—upon my deliberate opinion that the fundamental rights of the accused were not properly safeguarded, and that this court must, in the interest of the orderly administration of justice, express its disapproval of the loose and highly prejudicial procedure which the record shows was tolerated.

The accused was indicted and prosecuted for the crime of murder. The record shows that it was rumored prior to the trial that counsel for defendant would make no serious effort to show that the accused was not in fact guilty of the crime charged, but that a serious effort would be made to induce the jury to render a qualified verdict of murder without capital punishment. Local and other newspapers carried stories to this effect. The record discloses further that, during the progress of the trial and in argument, counsel for defendant were interested principally in saving the life of the accused. I infer

from the record, from the brief filed, and from the oral argument that counsel would have been satisfied with a verdict of guilty as charged provided the extreme penalty had been remitted. What they wanted for their client, who is a woman, was life imprisonment and not death as punishment.

The record shows that the details of the alleged crime were widely publicized by local and other newspapers and that the people generally were intensely interested in the outcome of the trial. The rumor having spread abroad that the accused's main plea would be to have her life spared, there seems to have been a determined effort made to have the extreme penalty inflicted.

A local paper carried a story in which it was said that the Texas attorney who assisted the district attorney in the prosecution, and who was personally acquainted with the slain man and with his widow and daughter, made the statement that his purpose was to see that the defendant was hanged. This story was published before the trial. During the trial and in argument, this attorney and the assistant district attorney made it perfectly clear that they were demanding a verdict which would carry with it the death penalty.

The populace clamored for the death penalty. They demanded the life of the accused and clearly manifested their desires to the jury by signs and gestures which could not be misunderstood. The trial was attended by throngs. Hundreds more than could be seated crowded into the courthouse. The courtroom was literally packed and jammed with spectators.

The judge says that more than 150 either stood or were seated within the railing which separated his stand from the space reserved for spectators. The record clearly shows that they were present not merely through interest, but for the purpose of letting it be known that they demanded the death penalty instead of punishment by life imprisonment. The members of the jury unquestionably knew what they were there for, because it is shown that they heard outcries and observed in the courtroom and on the streets certain signs and gestures which clearly showed that public sentiment against the accused was at fever heat and that no punishment inflicted upon the accused except that of death would appease the wrath of the throng.

It must be borne in mind that the members of the jury knew, and the throngs which attended the trial knew, that the main issue then involved was whether the accused should be hanged or whether she should be imprisoned for life.

Under such circumstances, I cannot believe that the verdict rendered was not, in some measure at least, influenced by public sentiment. To say the least, the atmosphere of hostility toward the accused which prevailed and which the members of the jury were made to understand, and the signs and gestures which they saw in the courtroom and elsewhere, were such as might have swayed the members of the jury from the exercise of that calm and deliberate judgment upon which the verdict should have been based. It is impossible for an accused person to secure a fair and impartial trial and verdict where a large

and hostile crowd assembles in and about the courtroom and is permitted to indicate by outcries and gestures the kind of verdict demanded.

In fairness, it must be said that a trial judge under ordinary circumstances does not expect, and therefore cannot prevent, outcries, outbursts, and applause from the spectators in his courtroom. But in this case the judge had reason to anticipate such conduct, and, in my opinion, it was his duty to take steps to prevent it.

It was irregular and highly improper for him to permit 150 or more persons to crowd within the rail and thereby disturb the jurors and counsel. He stated in his per curiam that he was powerless to prevent a scene of this kind. He evidently had in mind the constitutional guarantee that every accused person is entitled to a public trial. But that constitutional provision cannot be interpreted to mean that spectators must be permitted so to crowd the courtroom as to interfere with orderly procedure.

"A criminal trial should be public in the ordinary and common-sense acceptation of the term. The doors of the courtroom should be open, the public admitted, and the trial public in all respects, with due regard to the size of the courtroom, the convenience of the court, the right to exclude objectionable characters and youths of tender years and to do other things which may facilitate the proper conduct of the trial. * * * The right of an accused is not infringed because the courtroom is not large enough to include all persons or because of an order closing the doors after the room is filled. The court has the right to limit the number to be admitted to the seating capacity of the courtroom." 14 Am.Jur., p. 865.

I quote the following text from 16 C.J., page 810, § 2059:

"It is the duty of the court to see that public sentiment is not expressed to, or in the presence of, the jury in such a way as to be likely to influence their determination. Hence improper remarks, applause, laughter, or other improper conduct on the part of bystanders in open court during trial which tends to influence the minds of the jury against defendant, or by which defendant's right to a fair trial is otherwise infringed, may furnish grounds for setting aside the verdict and for a new trial, or for a reversal of a conviction, unless the court counteracts any prejudice that might be caused thereby by promptly taking steps to suppress the improper conduct and prevent its repetition, by reprimanding or punishing the bystanders who participated therein, and by directing the jury not to give it any attention but to decide the case according to the evidence, especially where no objection is made by defendant."

This court has held more than once that a verdict should not be set aside because of outcries from the audience, where the judge takes proper precautions to suppress them and admonishes the jury to disregard them. In the case of State v. Warlick, 179 La. 997, 155 So. 460, the defendant was being prosecuted for killing his stepson. On cross-examination by the dis-

trict attorney, he was asked whether he did not, a short time before the shooting of the deceased, load his gun and go to the mattress factory where the deceased worked and say that he was going there to kill him. He answered that he did not; whereupon, a youth sitting in the audience exclaimed, "Yes, you did; I saw you."

This court was asked to set the verdict aside because of this outburst. We declined to do so because the record disclosed that the trial judge immediately stopped the examination of the witness and ordered the youth who made the outcry to come before the bar, evidently expecting to administer punishment. But it developed that the boy was a brother of the deceased and was a mere child. When knowledge of this fact came to the judge, he immediately ordered the jury to retire and in the absence of the jury ordered the sheriff to deliver the youth over to a juvenile officer. When the jury was brought back into court, the judge charged them to disregard the incident, and the trial continued. It was conceded by counsel for both sides that neither the district attorney nor anyone else connected with the prosecution was responsible for the incident.

In support of our ruling we cited the cases of State v. Renaud, 50 La.Ann. 662, 23 So. 894; State v. Wimby, 119 La. 139, 43 So. 984, 12 L.R.A.,N.S., 98, 121 Am. St.Rep. 507, 12 Ann.Cas. 643, and 12 Cyc. 730.

In each of these cases, not only did the judge take every precaution possible to prevent further outbursts, but he cautioned the jury to pay no attention whatever to them.

With all due respect to the trial judge in this case, I think it was within his power, and that it was his duty, to prevent certain conditions and happenings which were calculated to swerve the independent judgment of the jurors.

Under the circumstances which prevailed, I think it is in the highest degree improbable that the jury as a whole could have kept its judgment free from the influence of the demonstrations made against the accused in the courthouse and in the immediate vicinity thereof.

The rule which this court long ago laid down and to which it has consistently adhered is that applause and demonstrations of bystanders in the courtroom, promptly checked by the judge, are not ground for a new trial. But that rule is not applicable to the case at bar because here the court made no serious effort to counteract the prejudice which necessarily resulted from these clear manifestations of hostility toward the accused. These were intended to, and I have no doubt did, influence the minds of the jurors against the defendant.