## COMMONWEALTH *vs.* EUGENE APPLEBY.

Essex. October 5, 1970. — December 16, 1970.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, & QUIRICO, JJ.

*Search and Seizure. Arrest. Practice, Criminal,* Assistance of counsel, Dismissal of indictment. *Evidence,* Of test. *Homicide. Constitutional Law,* Equal protection of laws.

Evidence at the hearing of a motion to suppress in a murder case warranted conclusions of the trial judge that a tenant voluntarily consented to a search of rooms occupied by him by police officers without a warrant, and that seizure then of trousers on a chair in plain view, shoes and a wallet owned by the defendant, who had no key to the rooms but stayed in them from time to time with the tenant's acquiescence, was lawful. [411]

Circumstances known directly to police officers respecting the murder of a woman in a lodging house in which the defendant stayed from time to time in rooms on the same floor as the victim's room warranted conclusions that the officers had probable cause to arrest the defendant and that he was under arrest while at a police station to which he was brought some hours after the victim's bloody corpse was found in her room; and, after the defendant had been advised of his constitutional rights, an examination of his clothing was a search incidental to his lawful arrest, and it and a reasonable examination of his person by a benzidine test, a test of scrapings taken from his fingernails, and an analysis of his clothing for blood, conducted without any statements by him, were lawful even though conducted in the absence of his counsel. [412–413]

Error, if any, committed at a murder trial by the admission in evidence of a bloody shirt of the defendant was an inconsequential contribution

to the case against the defendant and was harmless beyond a reasonable doubt. [414]

A motion to dismiss an indictment was properly denied under the rule stated in *Commonwealth* v. *Galvin*, 323 Mass. 205, 211–212, that a court will not inquire into the competency or sufficiency of the evidence before a grand jury. [414]

Conviction of a defendant of murder in the first degree of an elderly woman residing in a lodging house was warranted by circumstantial evidence, principally evidence that the defendant was permitted to stay in rooms near the room of the victim, that he was seen in the lodging house on the night before the victim's bloody corpse was discovered in her room, and that the defendant's body and clothing had bloodstains on them when he was apprehended, and by scientific evidence correlating bloody tissue and other matter found on the victim's body, clothes, or possessions with similar matter found on the defendant's body or clothes. [414–415]

At the trial of an indictment for murder in the first degree under G. L. c. 265, § 1, there was no error or denial of equal protection of laws where the judge instructed the jury that intoxication of the defendant could be considered on the issue of "deliberately premeditated intention to kill" but refused to give an instruction that intoxication could be considered on the issue of extreme atrocity or cruelty, as to which it was not necessary to show premeditation or knowledge of the defendant that his conduct constituted extreme atrocity or cruelty. [415–416]

INDICTMENT found and returned in the Superior Court on May 17, 1968.

The case was tried before *Coddaire*, J.

*John A. McNiff* for the defendant.

*John N. Nestor*, Assistant District Attorney, for the Commonwealth.

CUTTER, J. Appleby was found guilty of the first degree murder of Mary McCue, a seventy-four year old resident of the Hotel Touraine, a lodging house in Lynn. Her naked, bloody corpse was found in her room about 9 P.M. on Sunday, March 10, 1968. There was evidence of sexual assaults and other abuses which need not be set forth in detail. The jury recommended that the death sentence be not imposed.

The trial was conducted subject to G. L. c. 278, §§ 33A–33G. Appleby in his appeal assigns as error (a) the trial judge's pre-trial denial of motions to suppress certain evidence, which was later admitted, and to dismiss the in-

dictment, (b) the denial of motions for directed verdicts, and (c) certain portions of the judge's instructions to the jury.

The trial judge for two days received testimony with reference to the motions to suppress evidence and to dismiss the indictment. After making careful findings, he allowed the motion to suppress so far as it related to statements by Appleby at his interrogation at the Lynn police station on the early morning of March 11, 1968. Otherwise he denied the motions. Much of the evidence received at the pre-trial hearing was again introduced in substantially the same form before the jury at trial.

On the motion to suppress, the trial judge, upon somewhat conflicting evidence which warranted his findings, found the following facts. When Mary McCue's body was discovered in room 116 of the Touraine, the police were called and came promptly to the scene. Robert B. Williams, as tenant and full time occupant, rented rooms 101 and 102. For about a month, he had permitted Appleby to stay with him. Appleby paid no rent and sometimes slept in a chair. Lieutenant Perlino received permission from Williams[1] to look around his apartment with other officers. Appleby's trousers (as the evidence showed, on a chair in plain view), and shoes, both of which had stains which "resembled blood stains," and his wallet were in the room. The police took them for examination.

About 3 A.M. on Monday, March 11, Appleby was asked to go to the police station. He then "was effectively under arrest." He was questioned until 5 A.M. Shortly after the questioning began, he was warned "pursuant to" *Miranda* v. *Arizona,* 384 U. S. 436. He then declined "to sign a waiver form," but did so after 5 A.M. when he requested an attorney. The police secured the services of a public defender.

---

[1] Williams, at the motion hearing, testified that the police did not ask his consent to enter his room. The police witnesses, on the other hand, testified that Williams (a) invited them to his room, (b) indicated that they "could look around," (c) said that he had "nothing to hide," (d) coöperatively offered to help in any way possible, and (e) told them that they could take the trousers and shoes, which were not his, but belonged to Appleby.

Commonwealth *v.* Appleby.

During the inquiry at the police station, Appleby's "shorts were examined, fingernail scrapings were taken, and . . . [Appleby] underwent a benzidine test" of portions of his body to check whether evidence of blood marks existed. Appleby had no counsel present.

The judge made the following rulings. (1) Williams as tenant of rooms 101 and 102 could "permit the entrance of whomever he wished" and his "consent, validly obtained, was sufficient authorization for the police to enter and search those rooms"; (2) No right of Appleby was violated by the "search and seizure subsequent to validly obtained consent by [Williams,] an appropriate party"; (3) The benzidine test and the inspections of Appleby's shorts and fingernail scrapings "are not events requiring the presence of counsel."[2]

The following additional facts could have been found from the evidence at trial. Mary McCue was last seen alive about 7:30 P.M. on Saturday, March 9, by Williams and Henry M. Zane, another lodger at the Touraine. Appleby had gone to a bar with Williams on Saturday morning. Appleby returned to Williams's rooms after midnight, perhaps as late as 1 A.M., early Sunday morning. He had been drinking. Williams described him as staggering. Zane, who saw him upon his return, did not think him drunk. Appleby just "flopped" in a chair. Williams found him the next morning "flopped on the floor on his face," just waking. They had breakfast together. Appleby left during the day to attend the christening of his sister's child. He borrowed a suit from Williams to wear to the christening. Appleby went to his sister's house, attended the christening in the afternoon, and then went off to work on Sunday evening. That evening Mary McCue's body was found and the investigations already described took place.

Joseph V. Lanzetta, a chemist employed by the State police, testified concerning the tests administered to Appleby

---

[2] The judge also ruled that "ambiguity . . . surrounding the alleged waiver . . . [at the police station fell] short of convincing . . . [him] that" Appleby "knowingly and intelligently waived his right to have counsel at his interrogation." The oral statements then received tended to incriminate Appleby. These were suppressed and were not offered in evidence at trial.

at the police station, to his clothing and fingernail scrapings, and to various items found on or near Mary McCue's body. This testimony is mentioned in greater detail later in this opinion.

1. We assume (without deciding) that Appleby has standing to question the propriety of the search of Williams's room (see *Jones* v. *United States*, 362 U. S. 257, 263–267) because he stayed there from time to time with Williams's acquiescence, and because he owned the seized items. See *Simmons* v. *United States*, 390 U. S. 377, 389–390. The evidence, however, amply warrants the conclusion that Williams gave consent to the search. Williams had the primary claim to the use and possession of rooms 101 and 102. Appleby used the rooms only because of Williams's permission and had no key to the rooms. His privilege of access to them was greatly inferior to that of Williams. The latter, controlling the premises, could consent to the search, and the evidence disclosed by the inspection of the rooms could be used against others with an equal or inferior claim to use the premises, even though they had not consented. *Commonwealth* v. *Connolly*, 356 Mass. 617, 624. See *Frazier* v. *Cupp*, 394 U. S. 731, 740 (jointly used storage bag). Other cases are collected in *Commonwealth* v. *Martin*, *ante*, 282, 286–290.

The judge, on the evidence, reasonably could conclude that the consent was voluntary. Williams should have known that everyone in the building, particularly any person acquainted with Mary McCue, must be under suspicion. Since he had nothing to hide, he had every incentive to clear himself. He testified at trial that the police "are always welcome in my room." Cf. *Bumper* v. *North Carolina*, 391 U. S. 543, 549–550, where the searching officer represented that he had a warrant, the warrant was not shown to be valid, and the consent to the search, accordingly, was held ineffective.

Appleby's trousers were in plain view on a chair. No search was required of any receptacle or enclosed area belonging only to Appleby. They were seen by the officers when lawfully on the premises. See *Harris* v. *United States*,

390 U. S. 234, 236, and cases cited. Cf. *United States* v. *Retolaza*, 398 F. 2d 235, 237–238 (4th Cir.).[3]

2. About 3 A.M. on Monday, March 11, two police officers went to Appleby's place of work. They told him that Captain Silk "would like to talk to him at the police station," and "he very readily agreed to go." There he appeared before several officers. He was asked about his activities on Saturday, March 9. He then was warned, as the judge found. Appleby was wearing a jersey shirt and shorts (then seized) on which blood was later found. Benzidine tests were made of Appleby's hands, lower body, thighs, and genitals. These tests revealed the presence of heavy concentrations of blood. Photographs of the results of these tests were made. Fingernail clippings were taken from Appleby's hands. These were tested later. A shirt worn by him on Saturday was obtained from his sister.

Appleby was not formally booked until shortly after 5 A.M. when the tests and police interrogation had been completed. Although the police denied that he was under arrest when taken into the station, it was reasonable for the judge to infer, as he did, that Appleby was effectively under arrest while at the police station. He certainly would not have been allowed to leave if he had tried to do so, in the face of the substantial evidence providing probable cause for his arrest. Blood had been found around the crotch of his trousers and on his shoes, as well as on Mary McCue. He had been living on the same floor of the Touraine premises as the victim and knew her. He had been present on that floor on Sunday morning (shortly after midnight and at

---

[3] It was, of course, important for the police promptly to take possession of tangible evidence of guilt which properly came to their attention immediately after the discovery of a most serious crime. If not seized, Appleby's trousers and shoes might have been concealed or destroyed, or have disappeared. See *Schmerber* v. *California*, 384 U. S. 757, 770–771. Cf. *Preston* v. *United States*, 376 U. S. 364, 368. It was desirable that their owner be found before he destroyed evidence, e.g. by washing himself or destroying or cleaning garments worn by him. See *Chappell* v. *United States*, 342 F. 2d 935, 938 (Ct. App. D. C.); *Brent* v. *White*, 398 F. 2d 503, 505 (5th Cir.). Cf. *McDonald* v. *United States*, 335 U. S. 451, 454–456 (importance of "exigencies" and emergency circumstances, where a search warrant otherwise would be required); *Vale* v. *Louisiana*, 399 U. S. 30, 35.

breakfast) between the last occasion when Mary McCue had been seen alive and the discovery of her body. An autopsy made about 12:30 A.M. on Monday, March 11, had revealed that the victim had died from strangulation approximately twenty-four to forty-eight hours earlier.[4]

The examination of clothing worn by Appleby at the police station was a search incidental to his arrest. That arrest was based on circumstances known directly to the police, which reasonably led to the belief that he had committed a felony. *Commonwealth* v. *Holmes*, 344 Mass. 524, 525–526. See *Commonwealth* v. *Brown*, 354 Mass. 337, 342–343. Cf. *Wong Sun* v. *United States*, 371 U. S. 471, 480–487. Because there was probable cause for Appleby's detention, *Davis* v. *Mississippi*, 394 U. S. 721, has no application. The examination of his person by the benzidine test and the clipping of his fingernails were reasonable. They are not shown to have caused any pain, and did not extend beyond the surface of his body. *Brent* v. *White*, 398 F. 2d 503, 505 (5th Cir.). More extreme medical tests have been sustained. *Breithaupt* v. *Abram*, 352 U. S. 432, 435–437 (blood test for alcohol). *Schmerber* v. *California*, 384 U. S. 757, 759–762 (blood test). Cf. *Rochin* v. *California*, 342 U. S. 165, 172 (compelled use of stomach pump).

The evidence obtained by the benzidine test, the fingernail test, and the analysis of garments for blood did not cause any testimonial communication or statement of any type by Appleby. Thus no question of self-incrimination was presented. A competent expert merely observed physical facts by appropriate scientific means. Appleby had no proper claim to the presence or advice of counsel (see the *Schmerber* case, at pp. 765–766; *United States* v. *Wade*, 388 U. S. 218, 227–228), even if his consent to the tests for any reason was ineffective.

The examination of Appleby's clothing and tests upon his

---

[4] Appleby and Mary McCue both had type A blood. This fact probably was not known at the time of the police interrogation. The evidence indicates that type A is the second most common type of blood, and that thirty-five to forty per cent of the population of the Commonwealth have this type.

body at the police station did not depend on any interrogation of Appleby in violation of *Miranda* v. *Arizona,* 384 U. S. 436, 479. It may be that the shirt obtained from the house of Appleby's sister was discovered partly as a consequence of the interrogation and in part because Williams had given information about lending Appleby a suit to wear to the Sunday christening of his sister's child. Appleby's visit to his sister thus was known. The primary and convincing evidence of blood on Appleby's clothes and person came, however, from the lawful examination of his body, of the trousers and shoes lawfully seized in Williams's room, and of the clothing actually worn by Appleby at the police station. The evidence of blood on the shirt, in any event, was an inconsequential contribution to the case against Appleby. If there was error in admitting evidence about the shirt, that error was harmless beyond a reasonable doubt. *Harrington* v. *California,* 395 U. S. 250, 254.

3. The defendant's motion to dismiss the indictment seems to be based on the alleged illegality of the search of Williams's room, the seizure of Appleby's trousers, and the examinations of Appleby's person and garments at the police station in the absence of counsel. These actions were valid. The motion to dismiss in any event was properly denied under the rule stated in *Commonwealth* v. *Galvin,* 323 Mass. 205, 211–212, and cases cited. Nothing in *Commonwealth* v. *McCleery,* 345 Mass. 151, which rests on a meager record, should be taken as affecting the rule of the *Galvin* case.

4. There was no error in denying motions for a directed verdict. Appleby had opportunity to be in the Touraine at the crucial period. He was seen there on the night before the victim's corpse was discovered. The scientific evidence was sufficiently strong to permit the jury to find Appleby guilty beyond a reasonable doubt. See *Commonwealth* v. *Perez,* 357 Mass. 290, 303–305.

Lanzetta, the State police chemist, testified that traces of bloody tissue, fecal stains, and semen stains were found on Mary McCue's body, clothing, and bed sheet and on Appleby's clothing; that human hair similar in color and

appearance to that of Mary McCue was found on Appleby's trousers and shoes; that wool fibers consistent with those of Mary McCue's clothing were found in her fingernail clippings and those of Appleby; that a feather was found on Appleby's shoe which resembled (in color and microscopic appearance) a feather found on Mary McCue's clothing; and that fragments of egg shells were on the sole of Appleby's shoe and on the floor of Mary McCue's room. Reference has already been made to the highly significant benzidine tests which revealed bloodstains on Appleby's body and clothing.

5. The trial judge instructed the jury that if they found Appleby killed Mary McCue, but by reason of intoxication was "incapable of conceiving a deliberately premeditated intention to kill," he would not be guilty of murder in the first degree, but only of murder in the second degree. At the close of the charge, Appleby's counsel claimed an exception to the judge's "failure . . . to tell the jury that drunkenness is a fit subject for the [jury's] consideration . . . with respect to the element of specific intent in . . . first degree murder which is other than murder with deliberate, premeditated malice aforethought." The judge gave no further instruction. Appleby's attorney now argues that voluntary intoxication should be considered also as affecting the existence of "the express malice . . . inherent in . . . murder with extreme atrocity or cruelty."

Intoxication does bear on the issue of deliberately premeditated intention to kill. *Commonwealth* v. *Taylor,* 263 Mass. 356, 362. See *Commonwealth* v. *Rogers,* 351 Mass. 522, 532–533, cert. den. 389 U. S. 991; *Commonwealth* v. *Rollins,* 354 Mass. 630, 634–635. Under G. L. c. 265, § 1, murder with extreme atrocity or cruelty constitutes murder in the first degree. It is not necessary, however, to show that such atrocity or cruelty was premeditated or that the defendant knew his conduct constituted extreme atrocity or cruelty. *Commonwealth* v. *Desmarteau,* 16 Gray, 1, 9–11. *Commonwealth* v. *Gilbert,* 165 Mass. 45, 57–59. See *Commonwealth* v. *Clark,* 292 Mass. 409, 414 ("murder in the first

degree . . . may but does not always require deliberately premeditated malice aforethought"). There was no error.[5]

6. We perceive no reason in justice for disturbing the judgment by the exercise of the powers of this court under G. L. c. 278, § 33E (as amended through St. 1962, c. 453).

*Judgment affirmed.*

---

[5] There is no denial of equal protection of the laws in (a) permitting intoxication to be considered on the issue whether there exists deliberately premeditated malice aforethought, to which it has reasonable relevance; and (b) refusing to give it consideration on the issue of the existence of extreme atrocity and cruelty as to which intent to be cruel is not pertinent. The statute, as interpreted by this court (see St. 1858, c. 154), applies to all offenders equally in like circumstances. Cf. *Baxstrom v. Herold,* 383 U. S. 107, 115.