COMMONWEALTH *vs.* JOHN S. STEWART.

Suffolk. May 3, 19, 1971. — June 16, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, QUIRICO, & BRAUCHER, JJ.

*Practice, Criminal,* Mitigation of penalty, Capital case, Examination of jurors. *Constitutional Law,* Due process of law. *Jury and Jurors. Evidence,* Admissions and confessions. *Intoxication. Intent.*

This court declined to revise the holding in *Commonwealth* v. *McNeil,* 328 Mass. 436, that under G. L. c. 265, § 2, a verdict of guilty of murder in the first degree requires the death penalty unless the jury unanimously join in adding a recommendation of mitigation of penalty to the verdict. [676] CUTTER, J., concurring.

Imposition of the death penalty upon a verdict of guilty of murder in the first degree without a recommendation by the jury as a part thereof that the sentence of death be not imposed, after a trial at which evidence to mitigate punishment was excluded, did not deny the defendant due process of law; nor was the defendant entitled to an instruction as to what standards the jury should apply in determining whether to recommend mitigation. [677]

There was no merit in a contention that a verdict of guilty of murder in the first degree without a recommendation that the sentence of death be not imposed was invalid because the jury had been chosen in conformity with G. L. c. 278, § 3. [677]

At the trial of an indictment for murder in the first degree of a police officer, there was no abuse of discretion on the part of the judge in refusing to ask prospective jurors "Have you any friends who are police officers?" [677]

At a murder trial, where the defendant testified that he was intoxicated when the crime was committed and contended that intoxication vitiated a waiver of his right to remain silent when he made certain statements while in custody immediately after the crime and made other statements soon thereafter while at a police station, findings by the judge after an extensive voir dire on the making of each of such statements disclosed that there was no error in his ruling that they were made voluntarily, and in his admitting them in evidence. [677–679]

At the trial of indictments for armed robbery and for murder committed during the commission of the robbery, where the defendant's principal defence was intoxication, there was no error in the refusal of his request for an instruction that intoxication "may negative the existence of specific intent," or in the judge's charge to the jury that "you cannot find the absence of a specific intent solely because you find drunkenness." [679]

INDICTMENTS found and returned in the Superior Court on March 19, 1969.

The cases were tried before *McLaughlin,* J.

*William P. Homans, Jr., (Thomas G. Shapiro* with him) for the defendant.

*Newman A. Flanagan,* Assistant District Attorney, *(Elizabeth C. Casey,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

SPALDING, J.   These are appeals under G. L. c. 278, §§ 33A–33G, from convictions under indictments charging murder in the first degree, armed robbery, assault with intent to murder while being armed, and assault with intent to rob while being armed. The jury did not recommend that the death penalty not be imposed.

There was evidence from which the jury could have found the following. The defendant, on March 17, 1969, was in the Tam Cafe in Boston for at least an hour prior to events giving rise to this prosecution and may have been there earlier in the day. He had four or five beers during this period. About 5 P.M., just as the bartender, Ralph J. Ciralli, was counting the day's receipts prior to being relieved by Joseph Trocano, the defendant threw a paper bag on the

bar and said, "Fill it up." Ciralli responded, "We don't sell beer to take out." "Go across the street." When he saw the defendant's gun, he said, "This guy must be nuts." The defendant repeated his demand and shot in the direction of Trocano. He then went to the front of the cafe and held a waitress, Florence Murtha, shooting again toward Trocano. Neither shot hit Trocano. He then took a wallet from one Erskine Diamond who had just entered the cafe. One Michael Clancy approached the defendant, who shot him in the shoulder. The defendant then took some money from one Joseph P. Flynn.

At this point, a policeman, Francis B. Johnson, who had been directing traffic on the corner and was in uniform, came in and grabbed the defendant from behind. There was a scuffle during which Officer Johnson tried to disarm the defendant. Trocano testified that during this struggle he hit the defendant with a chair, but that it had no effect on him. At some time while the defendant and Officer Johnson were locked together in this struggle, the defendant's gun went off. A bullet entered Officer Johnson's chest at point blank range, and both men fell to the floor, the officer saying, "I'm shot." One John N. Reilly hit the defendant over the head with a beer bottle. This dazed the defendant for a moment but seconds later he shot and wounded Reilly. Officer John Ryan then arrived and with the aid of another policeman, Philip M. Doherty, succeeded in subduing the defendant. Officer Johnson died shortly thereafter. The other two persons who were wounded recovered.

A series of admissions concerning the events described above were made by the defendant shortly after he was taken into custody. They were admitted following a voir dire on his sobriety. One of these statements was, "It was an armed robbery . . . no question about that." All of the above-mentioned witnesses who testified on the issue said that from their observation they concluded the defendant was not drunk at the time of the crimes. Although there was equipment for it at the police station, no test to determine the defendant's sobriety was performed.

The defendant's principal defence was intoxication. He testified in his own behalf that he had been in trouble with the law often and had had a drinking problem since he was very young. He had an alcoholic seizure in 1967. He testified to drinking most of a pint of brandy before breakfast on the day in question. After breakfast he walked around town and had a number of beers and brandies at various bars. He took with him a loaded pistol in a holster that was in turn placed in two brown paper bags which were folded over and wrapped with rubber bands. About noon he went to the Tam Cafe and had some beers. At that time he "wasn't hurting" and was "feeling good." He had visited the Tam on a number of previous occasions and talked with the bartender. After he left the Tam he had some more brandies and beer elsewhere and returned to the Tam about 3:30 P.M. He continued to drink beer until 5 P.M., the time of the events here involved. He testified that he was drunk when he started shooting the gun. It was his intention to try to sell the gun to the bartender and he had talked with him about the gun earlier. The bartender could not recall such a conversation. After the defendant said, "Fill it up," he remembered firing the gun once more, but did not remember what followed. He said he fired initially because he was confused and people were coming toward him. He wanted to frighten them away. When he said, "Fill it up," his intention was to get some beer. He did not recall threatening anyone other than Trocano or Ciralli with the gun and did not recall shooting at them. He said he did not remember "developing any intention to rob the bar . . . or any one in it." He recalled being asked questions at the police station, but said he was frightened and excited and could remember very little of what was said.

Dr. Albert Martin, a physician at the Massachusetts General Hospital, testified that he examined the defendant on the day in question, but was not asked to determine whether or not he was under the influence of alcohol. The hospital record indicates that the defendant was a "strug-

gling, uncooperative patient," which is consistent with being under the influence of alcohol. The jail medical records show that on the day in question his chief complaint was a "terrific headache." Mr. Maurice Merson testified that he was initially appointed to defend the defendant, and that when he talked with him at the Charles Street jail from March 18 to 20, the defendant was terrified and convinced that there was a plot by the police and guards to kill him. Acting medical director at Bridgewater State Hospital, Dr. Lawrence J. Barrows, testified that at the time of admission the defendant's memory was unclear as to the events of March 17 and that he gave a long history of being "a very heavy drinker and a user of amphetamines." From the history given by the defendant and the symptoms noted above, Dr. Barrows concluded that the defendant was under the influence of alcohol on March 17 and was suffering from withdrawal on March 18.

1. The defendant earnestly argues that G. L. c. 265, § 2, must be interpreted to require that the death penalty may not be imposed by less than a unanimous jury. Section 2 reads in relevant part: "Whoever is guilty of murder in the first degree shall suffer the punishment of death, unless the jury shall by their verdict, and as a part thereof, upon and after consideration of all the evidence, recommend that the sentence of death be not imposed, in which case he shall be punished by imprisonment in the state prison for life. No such recommendation shall be made by a jury or recorded by the court if the murder was committed in connection with the commission of rape or an attempt to commit rape."[1]

In discussing the recommendation in his charge to the jury the judge said, "Now, that recommendation must be unanimous. If it is not unanimous, there is no recommendation. If there is no recommendation, the punishment is mandatory death."

---

[1] This provision was added to G. L. c. 265, § 2, by St. 1951, c. 203. This statute also provided that there be no parole for one serving a life sentence for first degree murder. This provision was later modified to provide for commutation of sentence by the Governor and his council.

After the jury had been deliberating for about two and one-half hours, they sent the following question to the judge: "Is a unanimous decision necessary to determine clemency or not?" The judge sent back the following reply: "[The Supreme Judicial Court in] *Commonwealth* v. *McNeil*, 328 Mass. 436 [at page 442, in], discussing a recommendation that the death penalty not be imposed, said, 'To our minds the plain implication is that the verdict (murder, first degree) has its usual consequences of death unless the jury join in a unanimous recommendation of mitigation. Unanimity in the action of a jury is always required.'" The defendant duly excepted. Within fifteen minutes the jury returned a verdict of guilty without a recommendation.

The judge instructed the jury in accordance with our holding in the *McNeil* case. We have been asked to reëxamine that case in the light of decisions in other jurisdictions construing similar statutes. The decisions in other jurisdictions called to our attention by the defendant have been examined and a majority of the court are not persuaded that we should revise our holding in the *McNeil* case.[2] They reach this conclusion despite the argument of the defendant that such an interpretation renders the statute unconstitutional under the Sixth and Fourteenth Amendments. The writer of this opinion, however, in the light of the opinions cited in footnote 2 as well as the general humanitarian purpose of the statute would revise our holding in the *McNeil* case. The writer does not believe that the Legislature has confided to a single juror the choice of life or death for an accused, which is the situation under the *McNeil* case.

---

[2] These cases include, *Andres* v. *United States*, 333 U. S. 740; *People* v. *Hicks*, 287 N. Y. 165, 174; *State* v. *Reynolds*, 41 N. J. 163, 187; *People* v. *Hall*, 199 Cal. 451, 457 (reaffirmed in *People* v. *Green*, 47 Cal. 2d 209); *Smith* v. *United States*, 47 F. 2d 518, 520 (9th Cir.); *State* v. *Henry*, 196 La. 217, 233; *Price* v. *State*, 159 Md. 491, 494; *Howell* v. *State*, 102 Ohio St. 411; *State* v. *Hecker*, 109 Ore. 520, 559–560; *State* v. *McLaughlin*, 208 S. C. 462, 468–469; *State* v. *Goins*, 120 W. Va. 605, 609; and *State* v. *Best*, 44 Wyo. 383, 389–390. The cases in accord with the *McNeil* holding are *Green* v. *State*, 55 Miss. 454 (affirmed in *Fleming* v. *State*, 60 Miss. 434), and *Ex parte Skaug*, 63 Nev. 101.

2. The defendant's next argument is that the imposition of the death penalty in a unitary procedure from which evidence to mitigate punishment was excluded denied the defendant due process of law and the equal protection of the laws. This point has recently been decided contrary to the defendant's contention in *McGautha* v. *California*, 402 U. S. 183. The defendant further contends that if the *McNeil* case is followed, then the jury must be instructed as to what standards they should apply in determining sentence. We are not persuaded by this argument.

3. The defendant challenges the validity of a verdict returned by a jury chosen in conformity with G. L. c. 278, § 3, which excludes from the panel prospective jurors whose opinions on capital punishment would prevent them from finding a defendant guilty of a crime punishable by death. No argument is made that the judge did not act properly under the statute. This point was considered and rejected in *Commonwealth* v. *Connolly*, 356 Mass. 617, 622–623.

4. The defendant argues further concerning the jury selection that the judge erred in refusing his request to ask the prospective jurors: "Have you any friends who are police officers?" The judge did accept his request to ask: "Have you any relatives who are members of a police force?", and if so, "[W]hat is your relationship to such officer or officers?" There was no error. It is entirely within the judge's discretion under G. L. c. 234, § 28, and c. 278, § 3, whether to allow any questions other than those which the statutes require. *Commonwealth* v. *Ricard*, 355 Mass. 509, 510, 511. Even though the defendant was being tried for the killing of a policeman, there was no abuse of discretion in not asking this wide-ranging question.

5. During the trial the judge, after conducting two extensive voir dire examinations, ruled that certain statements made by the defendant were voluntary and admitted them in evidence. The defendant contends that these rulings were erroneous. Since they were both based on substantially identical contentions and testimony, they may properly be considered together.

We note initially that the defendant does not raise any procedural objection to the admission of these statements, conceding that the first was not made in response to any police interrogation and the second only after he was advised of his rights under *Miranda* v. *Arizona*, 384 U. S. 436. The first statement in question was testified to by Michael R. Clancy, one of the wounded witnesses. He said that on the way to the hospital the defendant said, "I should have shot a few more." The second statement complained of was a series of admissions the defendant made in reply to questions put to him while in custody and about one hour after the crimes in question.

The defendant's argument is that the waiver of his right to remain silent in both cases was not intelligently or voluntarily made, and that therefore these statements should have been excluded. He argues that his intoxication, fear, and confusion made a voluntary waiver of his right to remain silent impossible. After a voir dire on the first statement which included testimony of the defendant, the judge found that the statements were voluntary and set forth as his reasons the testimony of all the eyewitnesses and the "detail with which the defendant . . . [recited] the events which took place prior to the . . . shooting."

After the second voir dire, which included testimony by the officer who questioned the defendant at the police station, the defendant, Dr. Barrows, and Mr. Merson, the court again concluded that the statements made were voluntary, saying in part: "He voluntarily and intelligently waived his right to remain silent, and he elected to make a statement. I am incorporating in this hearing the evidence of all of the witnesses I have heard on the trial in chief, relative to the sobriety of the defendant on March 17, 1969, in the vicinity of 5:00 o'clock. . . . I find that the answers which he made to the questions as reflected in the statement were responsive, intelligent, and relevant, indicating to me a clear and a perceptive mind, and I therefore find that his mental faculties were not impaired by either liquor or drugs. . . . I find the statement that he made was completely voluntary and un-

affected by duress, force, threats, or promise of reward or favor."

There was no error. The judge had ample grounds for ruling that the admissions were competent.

6. The defendant finally urges us to reëxamine our law concerning the effect of intoxication on criminal responsibility. Specifically he excepts to the judge's refusal to give a requested instruction on this subject,[3] and to the judge's charge that "you cannot find the absence of a specific intent solely because you find drunkenness."

Although there is respectable authority in support of the requested instruction,[4] it was held in *Commonwealth* v. *Gleason*, 262 Mass. 185, 191, that a defendant was not entitled to an instruction "that in determining the defendant's intention [of committing the crime of robbery] the jury should consider whether he was under the influence of liquor." To the same effect is *Commonwealth* v. *Taylor*, 263 Mass. 356, 362. See *Commonwealth* v. *Hawkins*, 3 Gray, 463; *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615; *Commonwealth* v. *LePage*, 352 Mass. 403; *Commonwealth* v. *Appleby*, 358 Mass. 407. The judge correctly charged the jury in accordance with the foregoing decisions and we are not disposed to overrule them.

7. In accordance with our duty under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, we have reviewed the entire evidence and are of opinion that justice does not re-

---

[3] The defendant's requested instruction reads: "Although intoxication or drunkenness or being under the influence of drugs is not a defense, the fact that a person may have been intoxicated or under the influence of drugs or both at the time of the commission of a crime may negative the existence of specific intent. So, evidence that a defendant acted while in a state of intoxication or under the influence of drugs or both is to be considered in determining whether or not the defendant acted with specific intent, as charged. If the jury has a reasonable doubt from the evidence in the case whether, because of the degree of his intoxication or the influence of drugs or both, the mind of the defendant was capable of forming, or did form, a specific intent to commit or attempt to commit armed robbery, the jury should acquit the defendant of armed robbery or attempt to commit armed robbery and, furthermore, may not find the defendant guilty of murder in the commission or attempted commission of a crime punishable with death or life imprisonment."

[4] See Am. Law Inst., Model Penal Code, § 2.08 (Tent. draft No. 9) pp. 2–13.

quire us either to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*

CUTTER, J. (Concurring) The cases cited in the opinion of the court (fn. 2) show that most other courts have now reached a result different from that reached by this court in 1952 in *Commonwealth* v. *McNeil*, 328 Mass. 436, 441–442, with respect to G. L. c. 265, § 2, as amended by St. 1951, c. 203. The statutes interpreted by these other courts were in many (if not most) respects comparable to our own statute.

It may be that, as a matter of first impression, this court could have interpreted the 1951 amendment as requiring the trial judge to instruct the jury to recommend that the death penalty be not imposed if they were unanimous on the issue of guilt of first degree murder but divided on the issue of imposing the death penalty. In the event of a disagreement on penalty alone, such a charge would effect the imposition of the lesser penalty of life imprisonment. Such an interpretation would have been closer to the present decisions in other jurisdictions and might have avoided some constitutional doubts.

The interpretation made in the *McNeil* case, however, was made less than a year after the approval of the 1951 amendment (April 3, 1951) by a court which was at least generally familiar with its background and legislative history. The interpretation adopted has prevailed for nearly twenty years and is consistent with the statutory language. No sufficiently strong constitutional doubts exist (despite the great changes in decisions on many criminal law issues in the last twenty years) to lead me to vote to overrule the *McNeil* case. A change in our rule (to one which some may reasonably regard as more logical and more humanitarian) seems a matter for legislative rather than judicial determination. Accordingly, I concur in the opinion of the court.