COMMONWEALTH *vs.* STANLEY PINCKNEY.

Suffolk.    January 7, 1974. — April 4, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Practice, Criminal,* Examination of Jurors.    *Constitutional law,* Jury. *Jury and Jurors.*

At a trial for larceny in which police witnesses were not crucial to the Commonwealth's case, a judge did not abuse his discretion by refusing to question veniremen on whether they would give greater credence to the testimony of a police officer simply because of his position. [72-73]

That a larceny case involved the credibility of a black defendant and white prosecution witnesses was not a special circumstance entitling the defendant to have questions on racial prejudice put to the venire. [73-74]

INDICTMENT found and returned in the Superior Court on August 10, 1972.

The case was tried before *Linscott,* J.

*William P. Homans, Jr.,* for the defendant.

*Alfred E. Saggese, Jr.,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, J.    The defendant appeals under the provi-

sions of G. L. c. 278, §§ 33A-33H, inclusive, from his conviction of breaking and entering in the nighttime with intent to commit larceny. He assigns as error the judge's refusal to question the venire as to whether any of them felt any bias against the defendant because he is black or would give greater credence to the testimony of a police officer simply because of his position.

We summarize the relevant facts. On June 24, 1972, Priscilla Monge and Danielle Sahely left their third-floor apartment at 300 Commonwealth Avenue to go to the movies. On returning between 10:30 and 10:45 P.M., Monge switched on a 300 watt light in the hallway. As a result, the hallway was clearly lighted and the bedroom, straight ahead off the hallway, was also illuminated by the hall light. The two women noticed that an olive green beach type bag was on one of the beds and that the window was wide open. Monge walked towards the bed, observed the partially filled bag, and turned around to see a man standing in her closet. Both women had a good opportunity to observe this individual and later testified that he was black, of medium height and build, had bushy hair on the sides and a goatee, and was carrying a flashlight.

Thereafter, the two women ran out of the apartment, but returned to the bedroom within minutes. The man was observed standing by the bed putting Monge's handbag in his bag. Again, Monge had, she testified, a good, close look at the intruder, who then left through the window. Later, the women gave a police officer a detailed description of the invader.

The defendant testified that he had been in Richmond, Virginia, during the weekend of June 23-25. A long time friend, David Blanchard, testified that he accompanied Pinckney on the trip. According to defence witness Clarence Hagins, the defendant and Blanchard arrived in Richmond late in the evening on Saturday, the 24th, and stayed at his house until Sunday, June 25. Blanchard testified that they arrived in Richmond on Friday evening, June 23, or early Saturday morning, June 24.

Several weeks later on July 16, 1972, police officers

responded to a call at 298 Commonwealth Avenue about 1 A.M. Detective Varnerin and Officer Brady testified that they saw the defendant, carrying a bag, run out of the front door of 302 Commonwealth Avenue. The defendant testified that he had been in the area "scrounging" for art materials, and had run to avoid the police. He denied that he was carrying a bag. The officers testified that they observed the defendant drop the bag, which Detective Varnerin subsequently retrieved and placed in the police cruiser. They apprehended the defendant in the rear of 312 Commonwealth Avenue, removed gloves he was wearing and found a flashlight (which the defendant admitted at trial to be his) in the bushes. The defendant was then placed in the back seat of the cruiser with the bag, which he denied, at the time and at trial, was his.

While the defendant was in the custody of the police officers on July 16, Monge and Sahely, who had left their nearby apartment because of the commotion, recognized him as the same man who had been in their apartment on June 24, 1972. Monge also recognized the bag in the police cruiser as the same greenish olive bag she had seen in her apartment on the night of June 24. They immediately volunteered this information to the police officers.

1. As to the defendant's request that inquiry should be directed to prospective jurors as to whether they would give greater credence to the testimony of a police officer simply because of his position, it was within the discretion of the judge to refuse to put such question.[1] We have previously ruled that questions designed to elicit a pro-police bias need not be asked merely because requested by a defendant.[2] *Commonwealth* v. *Taylor*, 327 Mass. 641, 647. *Com-*

---

[1] The questions requested were: "4. Would you give the testimony of a police officer different weight than the weight given to the testimony of another witness simply because he is a police officer? . . . 5. Have you any relatives or friends who are members of a police force?"

[2] The trial judge did, in his discretion, go beyond the statutory requirements and asked the venire, after listing the police witnesses, "Are any of you related to or friendly with any of the parties mentioned or the witnesses mentioned?" Inquiry is only required as to "whether he is related to either party."G. L. c. 234, § 28.

*monwealth* v. *Stewart*, 359 Mass. 671, 677 (1971). This is true even in a homicide case where the victim was a policeman. *Commonwealth* v. *Stewart, supra.* In any case, the police witnesses were not crucial to the Commonwealth's case. The most important testimony came from the "civilian" victims who made firm identifications of the defendant as the burglar they saw in their apartment. We reiterate our prior holdings that whether to ask questions other than those prescribed by statute (G. L. c. 234, § 28) or court decisions rests within the sound discretion of the trial judge. *Commonwealth* v. *Geagan,* 339 Mass. 487, 504 (1959). *Commonwealth* v. *Kiernan,* 348 Mass. 29, 35-36 (1964). *Commonwealth* v. *Nassar,* 354 Mass. 249, 254 (1968).

2. The decision of the Supreme Court in *Ham* v. *South Carolina,* 409 U. S. 524 (1973), established that in the circumstances of that case it was a denial of due process for the trial judge to refuse to question the prospective jurors as to possible racial prejudice.[3] In *Commonwealth* v. *Ross,* 363 Mass. 665, 672-673 (1973), we held that the *Ham* decision was limited to situations where circumstances make the defendant "a special target for racial prejudice." See also *Commonwealth* v. *Ryles,* 363 Mass. 674 (1973); *Commonwealth* v. *Rodriquez,* 364 Mass. 87 (1973); *Commonwealth* v. *Bumpus, ante,* 66.

This case presents no such circumstances. The defendant was not a locally well known civil rights activist as was the defendant in the *Ham* case, but an artist and a teacher. Nor was there any indication, or even any claim, of police bias or any attempt to frame him. That the defendant took the stand and that his credibility as opposed to that of white witnesses was the crux of the case is not enough to create special circumstances requiring that specific questions on racial prejudice be put to the venire.

---

[3] The questions requested in the instant case were: "2. Do you have any previous bias or other feeling or emotion in respect to black persons that would affect you in your duty as a juror in a case in which a black person is a defendant? 3. Do you consider that black persons are more prone to commit crimes that white persons?"

The affidavit filed by the defence does not change our conclusion. It amounted to an argument of law intended to persuade the court of the defendant's position on the utility of such questions. In *Commonwealth* v. *Bumpus, ante,* 66, we note that absent circumstances analogous to those in the *Ham* case a judge may feel that such questioning as was requested by the defendant would be counterproductive. The affidavit raises no circumstances particular to this case requiring action by the judge but argues generally the desirability of specific questions as to racial prejudice, on the basis of limited empirical evidence of their effectiveness. We are not here concerned with what is desirable, however.[4] We have been asked to find that the trial judge's ruling was an abuse of discretion which operated to deprive the defendant of a fair trial in violation of his constitutional right to due process of law. We find no such error.

*Judgment affirmed.*

---

[4] On the question of desirability, see our observation in the *Bumpus* case concerning the serious responsibility of the trial judge to consider relevant circumstances when a defendant seeks such special inquiry.