# COMMONWEALTH *vs.* GREGORY SZCZUKA.

Essex.   November 7, 1983. — April 17, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Homicide.  Jury and Jurors.  Constitutional Law,* Jury, Assistance of counsel.  *Practice, Criminal,* Examination of jurors, Instructions to jury, Argument by prosecutor.  *Attorney at Law,* Conflict of interest.  *Conflict of Interest.  Witness,* Privilege.

The judge in a murder case did not err in denying the defendant's motion to dismiss the venire on the ground that the ages of the prospective jurors were so substantially disproportionate to the ages of the population of Essex County as not to represent a fair and reasonable cross section of the community. [671]

The judge in a murder case did not abuse his discretion in refusing to ask prospective jurors whether they would give greater credence to a police officer's testimony than to that of a private citizen, and whether they had "any feelings about the possession of firearms or handguns which would make it difficult . . . to render a fair and impartial verdict." [671-672]

At the trial of a murder case, during which the defendant, on one occasion, had been brought into the courtroom in handcuffs, there was no error in the judge's denial of the defendant's motion that the judge poll the jury as to whether they had seen the defendant before coming into the courtroom that morning.  [672-673]

In the circumstances, the defendant in a murder case was not prejudiced by certain remarks made by the prosecutor in closing argument, which the defendant interpreted as telling the jury that they could not consider the defendant's testimony that the victim had been carrying a knife because the testimony did not come in properly as evidence at trial. [673-674]

There was no merit to claims made by the defendant in a murder case that the judge failed to instruct the jury that self-defense is a defense not only to manslaughter but also to murder, that it was improper for the judge to instruct the jury that they could infer malice from the intentional use of a deadly weapon, and that the judge's charge led the jury to believe that because the defendant had used a deadly weapon they could not find him guilty of manslaughter. [674-675]

At the hearing of a motion for a new trial in a murder case there was no cred-
ible evidence requiring the judge to find that the defendant's attorney
had a conflict of interest. [675-676]

There was no merit to a contention made by the defendant in a murder case
that he had been denied effective assistance of counsel. [676]

At the hearing of a motion for a new trial in a murder case the defendant had
no standing to argue that the judge had erred in permitting the defendant's
wife to waive her privilege under G. L. c. 233, § 20, Second, not to
testify against her husband, or to argue that his wife had not been
adequately advised of her privilege by her attorney. [677]

Any error at the hearing of a motion for a new trial of a murder case in the
judge's refusal to compel the defendant's wife to testify because she
had waived her privilege under G. L. c. 233, § 20, Second, by testifying
at trial was harmless, where the defendant's offer of proof indicated that
the wife's testimony would have related to whether she had knowingly
waived her spousal privilege before the grand jury and at trial, and the
defendant had no standing to raise this issue. [677-678]

INDICTMENTS found and returned in the Superior Court De-
partment on January 10, 1979.

The cases were tried before *Barton*, J., and a motion for a
new trial was heard by him.

After review was sought in the Appeals Court, the Supreme
Judicial Court ordered direct appellate review on its own initia-
tive.

*James B. Krasnoo* for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney, for the
Commonwealth.

LIACOS, J. On January 10, 1979, two indictments charging
murder in the first degree were returned against the defendant,
Gregory Szczuka. The victims, Kevin Robinson and Kenneth
F. Wescott, had been shot by the defendant in Topsfield on
November 8, 1973, and died thereafter. On May 24, 1979,
an Essex County jury returned a verdict of guilty of murder
in the second degree on each indictment. Szczuka was sen-
tenced to concurrent terms of life imprisonment at the Mas-
sachusetts Correctional Institution at Walpole. He appealed
the convictions. On March 19, 1981, Szczuka filed a motion
for release from unlawful restraint pursuant to Mass. R. Crim.
P. 30 (a), 378 Mass. 900 (1979), which the judge treated as a

motion for new trial. Upon request of counsel, the defendant's appeal from his convictions was stayed pending the decision on his motion for new trial. This motion, as later amended, was denied after hearing. The defendant appealed the denial of that motion, and we transferred that appeal to this court on our own motion. As well as urging numerous grounds for reversal, the defendant asks us to exercise our power under G. L. c. 278, § 33E, to direct the entry of verdicts of manslaughter.[1] We affirm the convictions of murder in the second degree and the decision denying the defendant's motion for new trial.

We summarize the facts. On the evening of November 7 and in the early morning of November 8, 1973, Robinson and Wescott were at a lounge on Route 1 in Rowley with a group of friends. The group had arrived there about 9 P.M. Robinson, Wescott, and four friends left the lounge about 1 A.M. on November 8 and headed south on Route 1 in Robinson's automobile. They had consumed several pitchers of beer during the evening. The three male companions of the victims each testified at trial to having been "pretty much" drunk or "fairly drunk" when the group left the lounge. The fourth companion, a female, testified that she had had about four glasses of beer at the lounge and that her condition was "[f]ine" when she left. There was no testimony as to the condition of the two victims at the time.

The defendant and his cousin, Kenneth Carpenter, spent the night of November 7-8, 1973, at another bar on Route 1 in Rowley. They arrived there some time between 8 and 9:30 P.M. and left at about 1:30 A.M. Carpenter testified that they were both sober when they left; the defendant testified that he himself was "feeling good" and "had a buzz on," and a waitress who served them, a girl friend of the defendant, also testified that

---

[1] Since the offenses which resulted in the convictions of murder in the second degree on indictments charging murder in the first degree were committed before July 1, 1979, review under G. L. c. 278, § 33E, is available in this case notwithstanding the amendment to that section effected by St. 1979, c. 346, § 2. See *Commonwealth* v. *Davis*, 380 Mass. 1, 12-17 (1980).

he was "feeling good." They, also, went south on Route 1, the defendant driving his automobile.

Up to this point, the occupants of each automobile were complete strangers to those of the other. As to what occurred as the two vehicles drove south on Route 1, the testimony of the victims' companions, of Carpenter, and of the defendant conflicted. Suffice it to say that after some "senseless antics," *Commonwealth* v. *Keough*, 385 Mass. 314, 319 (1982), on the part of one or both drivers, both of them pulled over to the side of the road. The defendant's vehicle was somewhere from ten or fifteen feet to twenty-five yards ahead of that of Robinson. The defendant and Carpenter and the five male occupants of Robinson's automobile got out.[2] As the defendant left his vehicle, he reached under the seat and took out a .357 magnum revolver. He then walked toward the center of the road. It is undisputed that, as the group from the other automobile approached him, he held out the gun and shot first Robinson and then Wescott. Robinson was shot in the abdomen, and Wescott in the chest.

The defendant testified that the victims were each about four feet away from him when he fired. The distances given by the witnesses varied from three to ten feet. After they got out of the automobile, none of the victims' companions heard anyone in their group say anything, except for Robinson, who asked whether the defendant's gun was a popgun or a cap gun.[3] Their testimony was that the defendant said nothing. Carpenter did not hear anyone from Robinson's automobile say anything. He testified that he heard the defendant shout, "Get back in the car," as he pointed the gun at the advancing group. Neither Carpenter nor any of the victims' companions saw anything in the victims' hands as they approached the defendant. Accord-

---

[2] Two of the victims' companions testified that they did not see Carpenter get out, and Carpenter testified that all six occupants of the victims' automobile got out. According to their own testimony with respect to themselves, however, Carpenter got out, and the victims' female companion did not.

[3] One of the victims' companions was unsure whether he himself had said, "There's a gun," on seeing the defendant's weapon.

ing to their companions, Robinson and Wescott were walking at either a normal or a fast pace; Carpenter testified that the whole group was approaching very slowly.

The defendant testified that after he got out of his automobile he waved the gun at the approaching men to show them that he had it and told them to stop. He testified that two of the men were coming toward him "rapidly," "at a fast rate of speed." He heard Robinson say, "I don't think it's real." The defendant testified that he then saw Robinson take a knife out of his belt. The defendant told Robinson to stop, began to back off, and extended the gun. He testified that he was afraid for his life. When Robinson was about four feet away, the defendant fired, and Robinson fell. The defendant testified that the second victim, Wescott, then picked up the fallen knife and came toward him. The defendant also warned Wescott to stop and get back and, when he did not do so, shot him also.[4]

The defendant and Carpenter then got back in the defendant's automobile and drove off rapidly. Both victims were taken to Hunt Memorial Hospital in Danvers, where Wescott was pronounced dead the following evening. Robinson was later transferred to Massachusetts General Hospital, where he survived until April 5, 1974. The defendant was not identified as the assailant until December, 1978, when his wife gave the police information about the shootings.

On consideration of the whole case before us, we see no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial or to direct the entry of verdicts of manslaughter.[5] We turn to the defendant's more specific grounds of appeal.

---

[4] No knife was ever found.

[5] The defendant's reliance on *Commonwealth* v. *Keough, supra,* is misplaced. In *Keough* we upheld the trial judge's action in reducing the verdict of murder in the second degree to manslaughter pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979). We noted in *Keough* that a trial judge acting under the authority of rule 25 (b) (2) should be guided by the same considerations that have guided this court in the exercise of its powers under G. L. c. 278, § 33E. *Id.* at 319. While there are similarities in the fact patterns

1. *The judge's refusal to dismiss the venire.* Before jury selection, the defendant moved to dismiss the venire on the ground that the ages of the prospective jurors were so substantially disproportionate to the ages of the population of Essex County as not to represent a fair and reasonable cross section of the community. He appeals the denial of this motion as a violation of his rights under the Sixth Amendment to the Constitution of the United States and the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.[6] The simple answer to this claim is that "classifications based on age alone do not involve identifiable or distinctive groups for Federal constitutional purposes." *Commonwealth v. Bastarache,* 382 Mass. 86, 100 (1980). Additionally, we note that the judge found, and the record supports his finding, that the defendant failed to establish either a substantial underrepresentation or systematic or intentional exclusion of an identifiable group. Contrast *Commonwealth v. Aponte, ante* 494 (1984). The defendant did not establish the prerequisite basis of a claim of violation of the Sixth Amendment. See *Commonwealth v. Bastarache, supra* at 96-97. There was no error.

2. *The judge's refusal to ask the prospective jurors two voir dire questions requested by the defendant.* The defendant appeals the judge's refusal to ask each prospective juror (1) whether he or she "would be more likely to believe the testimony of a law enforcement officer than the testimony of a

---

of the two cases, there are significant differences as well. We do not conclude on this record that this defendant's actions were "characterized by fear, confusion, and anger." *Id.* at 320. The defendant Keough had no record of prior criminality, as does this defendant. To the extent alcohol was involved, we think that the defendant got the benefit of that factor by the jury's decision to render a verdict of murder in the second degree. We agree with the Commonwealth that the evidence in the case, including the use of a .357 magnum revolver, shows acts that "were clearly malicious and murderous."

[6] Though the defendant claims a violation of the equal protection clause, his argument is framed in terms of the test for a Sixth Amendment violation. We need not pass upon the claim of an equal protection violation, nor does it seem to be an appropriate claim for this case. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975); *Commonwealth v. Bastarache,* 382 Mass. 86, 96-97 (1980).

civilian witness about the same subject matter," and (2) whether he or she had "any feelings about the possession of firearms or handguns which would make it difficult . . . to render a fair and impartial verdict in this case." The judge did ask the prospective jurors the questions required by G. L. c. 234, § 28, first par., as well as numerous other questions relative to their impartiality. It is well settled that "[i]t is within the sound discretion of the judge whether to allow any questions other than those which are statutorily required under G. L. c. 234, § 28." *Commonwealth* v. *Cameron*, 385 Mass. 660, 667 (1982), citing *Commonwealth* v. *Stewart*, 359 Mass. 671, 677 (1971). Specifically, we decline to accept the defendant's suggestion that we overrule our decisions in *Commonwealth* v. *Walker*, 370 Mass. 548, 572, cert. denied, 429 U.S. 943 (1976), and *Commonwealth* v. *Pinckney*, 365 Mass. 70, 72-73 (1974). We held in those cases that it is within the discretion of a judge whether to put a question to prospective jurors as to whether they would give greater credence to a police officer's testimony than to that of a private citizen. Cf. *Commonwealth* v. *Nickerson*, 388 Mass. 246, 249 (1983). There was no error in the judge's refusal to ask either of the above questions.

3. *The judge's refusal to poll the jury to determine whether they had seen the defendant in handcuffs.* On the day that the Commonwealth opened its case, the defendant moved that the judge poll the jury as to whether they had seen the defendant before coming into the courtroom that morning. The defendant's counsel stated that he was not sure whether the entire jury were already in the jury room when the defendant was brought into the courtroom in handcuffs. The judge refused to poll the jury, stating that he did not want "to make a mountain out of a molehill." He did, however, instruct the jury in his charge to them that "[t]he fact that a defendant . . . might have been held in custody . . . is not to be regarded as a circumstance tending to incriminate the defendant or creating against him unfavorable impressions." There was no error in the judge's action on this issue, especially since the defendant made no claim that any member of the jury actually saw him in handcuffs. *Commonwealth* v. *Dustin, ante* 481, 486 (1984).

See *Commonwealth* v. *Edgerly*, 390 Mass. 103, 106-107 (1983); *Commonwealth* v. *MacDonald (No. 2)*, 368 Mass. 403, 409-410 (1975).

4. *The prosecutor's closing argument.* The defendant claims that the prosecutor misstated the law in his closing argument and that the misstatement was insufficiently cured by the judge's instructions. After suggesting that the defendant had intruded the knife into the case "so as to cloud the issue" and referring to the testimony by Carpenter, the victims' companions, and the police that they had not seen a knife, the prosecutor continued: "Where is the knife? What independent proof is there of any sort of knife in this case other than the mere words spoken by the defendant? I suggest to you there is none. And to introduce it without proof, I suggest to you, does not give that particular defense much credence. You can't just raise an issue in a case by mere words, unsupported, and walk away from it and hope someone accepts it and buys it. That isn't the method of proof in criminal cases, and it shouldn't be the method of proof here." At this point the defendant's counsel objected, and the judge instructed the jury: "With respect to the law in this case, Mr. Foreman and members of the jury, you will get the law from the Court after the argument. Counsel's function is to summarize the facts, not the law."

The defendant argues that, in effect, the prosecutor told the jury that they could not consider the defendant's testimony about the knife because it did not come in properly as evidence at trial. With the arguable exception of the last sentence quoted, this portion of the prosecutor's closing argument was a permissible comment on the credibility of the defendant's testimony. See *Commonwealth* v. *Cheek*, 374 Mass. 613, 618 (1978). If the last sentence quoted is interpreted as a statement that the defendant's testimony was not admitted properly, it is a misstatement of the law. But even assuming that this is the proper interpretation, an assumption which is highly questionable, we think that any harm to the defendant was cured by the judge's prompt instruction to the jury and by his later charge, to which

the defendant did not object.[7] See *Commonwealth* v. *Borodine,* 371 Mass. 1, 9 (1976), cert. denied, 429 U.S. 1049 (1977). In the judge's charge he told the jury that it was his function to instruct them as to the law of the case and that they alone were to determine the weight, effect, and value of the evidence and the credibility of the witnesses. We note also that the prosecutor himself told the jury that it was the judge's function to give them the law. In these circumstances, it is clear that there was no prejudice to the defendant. See *Commonwealth* v. *Atkins,* 386 Mass. 593, 602 (1982).

5. *The judge's charge.* The defendant makes three arguments that the judge's charge warrants a reversal of his convictions.[8] Although the defendant did not object to the charge at trial, we review his claims by virtue of the broad scope of review mandated by G. L. c. 278, § 33E. See *Commonwealth* v. *Burbank,* 388 Mass. 789, 793-794 (1983); *Commonwealth* v. *Cole,* 380 Mass. 30, 38-39 (1980). We see no merit in these claims.

The defendant maintains that the judge failed to tell the jury that self-defense is a defense not only to manslaughter but also to murder.[9] On the contrary, the judge twice instructed the jury that "[s]elf-defense is a legal justification for conduct that would otherwise constitute murder or manslaughter." Furthermore, he twice instructed them that they must find the defendant not guilty if they found that the Commonwealth had failed to

---

[7] At the end of the prosecutor's closing argument, the defendant's counsel requested that the judge include in his charge an instruction that nothing which the prosecutor had said about only the defendant mentioning the knife should be taken to indicate that the defendant had some burden of proof on the issue of self-defense. Though the judge did not deliver such an instruction, he did charge the jury that the Commonwealth had to prove beyond a reasonable doubt that the defendant did not act in self-defense. We think that any implication in the prosecutor's argument that the defendant had the burden of proof on self-defense was cured by this instruction. See *Commonwealth* v. *Atkins,* 386 Mass. 593, 602 (1982). As mentioned above, the defendant made no objection to the charge.

[8] The third of these arguments is to be found in a letter from the defendant to his counsel which was received as an addition to his brief.

[9] The Commonwealth concedes that an instruction on self-defense was necessary.

prove beyond a reasonable doubt that he did not act in self-defense. This claim of error is spurious.

The defendant concedes that the judge's instruction that the jury could infer malice from the intentional use of a deadly weapon was correct. He asks us, however, to overturn well-settled precedent and to outlaw this instruction. See *Commonwealth* v. *Callahan*, 380 Mass. 821, 823 (1980). This we decline to do.

Finally, the defendant claims that the judge's charge led the jury to believe that, because the defendant had used a deadly weapon, they could not find him guilty of manslaughter even if they found that he had killed in a sudden heat of passion occasioned by reasonable and great provocation. Specifically, the defendant complains of the statement that "[i]n and of itself, it is never considered such provocation as entitles a defendant to use a deadly weapon to cause death." This statement did not mean that a defendant who is found to have killed in the heat of passion using a deadly weapon cannot be found guilty of manslaughter, but rather that heat of passion occasioned by sudden provocation does not warrant acquittal of a defendant on all criminal homicide charges. The crux of the sentence is the word "entitles." There was no error in the judge's reference to the use of a deadly weapon, since the defendant himself testified at trial that he shot the victim with a .357 magnum revolver.

Viewing the charge as a whole, *Commonwealth* v. *Richards*, 384 Mass. 396, 399-404 (1981), we conclude that the judge properly instructed the jury.

6. *The defendant's trial counsel's alleged conflict of interest.* The defendant makes three claims that his counsel at trial had a conflict of interest. He claims that his lawyer had an interest in the defendant's being convicted so that he would not give information against members of the Hell's Angels motorcycle club, whom his lawyer was representing or had represented. As the judge found at the hearing on the defendant's motion for new trial, this claim is without merit. The defendant himself testified at a pretrial hearing that he had no information about the Hell's Angels which would be useful to law enforcement

authorities.[10] The second claim is that a conflict of interest developed when the lawyer learned that the defendant and a member of the Hell's Angels had an ongoing altercation. That a lawyer represents two clients between whom there is a personal dispute does not in itself mean that he has a conflict of interest. There was no credible evidence of divided loyalties. See *Commonwealth* v. *Leslie*, 376 Mass. 647, 653 (1978), cert. denied, 441 U.S. 910 (1979). Cf. *Commonwealth* v. *Hodge*, 386 Mass. 165, 167-168 (1982). This claim is based on testimony of a witness whom the judge found not to be credible. The defendant's third claim of conflict of interest depends on certain testimony at the hearing on his motion for new trial, elicited from the woman with whom he had been living before his arrest. She testified that the defendant's lawyer sought to develop a personal relationship with her before and during the time of the trial. The judge found her testimony not worthy of belief.[11] We accept his finding, since the credibility of witnesses' testimony is within the province of the trier of fact. See *Commonwealth* v. *Franklin*, 376 Mass. 885, 898 (1978); *Commonwealth* v. *Leate*, 367 Mass. 689, 694 (1975).

The defendant also raises a claim of ineffective assistance of counsel during trial. The judge who conducted the hearing on the defendant's motion for new trial, who was also the trial judge in this case, concluded that the defendant had not demonstrated ineffective assistance of counsel. On consideration of the record and transcript, we also find this claim to be baseless.[12]

---

[10] The defendant's trial counsel made full disclosure of the potential problem and requested that the defendant be sworn and questioned about whether he had any such information. He did so for the very purpose of determining whether there was a conflict of interest because of which the lawyer should withdraw from representation of the defendant. The defendant understood this purpose and raised no objection at the time. Cf. *Commonwealth* v. *Leslie*, 376 Mass. 647, 656 (1978) (Liacos, J., concurring), cert. denied, 441 U.S. 910 (1979).

[11] The defendant's assertion that his trial counsel knew about an altercation between the defendant and a member of the Hell's Angels depended mostly on this same woman's testimony.

[12] The defendant's brief makes much of trial counsel's "inexplicable refusal" to summons the owner of the bar where the victims spent the evening

7. *Spousal privilege of the defendant's wife.* The defendant's wife testified at trial as a witness for the Commonwealth, waiving her privilege under G. L. c. 233, § 20, Second, not to testify. The defendant argues that his wife was not advised adequately of her privilege by her lawyer, who was appointed by the court for this purpose, and that as a result her waiver was not an intelligent one. He claims that the inadequacy of the advice was due to a conflict of interest on the part of the wife's lawyer.[13] The defendant argues that, but for the inadequacy of this advice, the wife would not have testified, and that her testimony created such prejudice that he should be awarded a new trial. He also argues that it was reversible error for the judge to admit the wife's testimony because he did not make an adequate determination as to whether her waiver was knowing. We do not reach the merits of these arguments because the defendant has no standing either to assert error in the judge's admission of privileged testimony, *Commonwealth v. Stokes*, 374 Mass. 583, 595 (1978), or to complain of a conflict of interest on the part of an attorney who owed him no duty.

On being called by the defendant to testify at the hearing on his motion for new trial, the defendant's wife asserted the G. L. c. 233, § 20, Second, privilege. The defendant argues that she should have been compelled to testify at the posttrial hearing because she waived her privilege by testifying at trial. He also argues that G. L. c. 233, § 20, Second, does not apply when the witness spouse is called by the defendant to testify on his behalf. We need not consider these arguments because the offer ·of proof made by the defendant's counsel at the hearing indicates that her testimony would have related to whether or not she knowingly waived her spousal privilege

of November 7-8, 1973, "to prove the drunken and violent behavior of the victims" on that night. However, defendant's appellate counsel himself told the judge at the hearing on the motion for new trial that he had decided not to call this man as a witness after hearing what his testimony would be on the stand. Trial counsel's failure to call this witness does not then appear in the least inexplicable.

[13] The alleged conflict involved the attorney's own financial interest.

before the grand jury and at trial.[14] As we have indicated, the defendant had no standing to complain that her waiver was not knowing. Any error in failing to compel the wife to testify at the motion hearing was therefore harmless,[15] as was any error[16] in excluding the wife's affidavit offered by the defendant in place of her testimony.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

[14] Part of the offer of proof did relate to a claim that four letters from the defendant to his wife which were introduced in evidence at trial should have been suppressed. We see no merit in the claim. Furthermore, written communications are not within the scope of the disqualification of "private conversations" provided by G. L. c. 233, § 20, First. See *Commonwealth v. Caponi*, 155 Mass. 534, 537 (1892). See also P.J. Liacos, Massachusetts Evidence 180-181 (5th ed. 1981).

The defendant argues that certain conversations between the defendant and his wife were wrongfully admitted at trial and that certain other conversations between them were wrongfully excluded. We see no merit in these arguments. Although some evidence of private conversations was initially allowed, on motion by the defendant's attorney the judge ordered this evidence to be struck. There was no violation of G. L. c. 233, § 20, First.

[15] Based on the offer of proof, the judge found that if the wife had been ordered to testify at the hearing on the motion for new trial, her testimony would not have shown a conflict of interest on the part of her attorney at the time of the defendant's trial because the attorney owed no duty to the defendant.

[16] We do not reach the question whether there was such error.